**UNITED STATES of America, Plaintiff,**

v.

**William Jay NEET, Jon Ray Neet, Frank Armando Cuaron, David Allen Van Omen, and Mary Grace Miller, Defendants.**

**Crim. A. Nos. 80–CR–281, 282 and 283.**

United States District Court,
D. Colorado.

Jan. 9, 1981.

Brian McConaty, Asst. U. S. Atty., Denver, Colo., for plaintiff.

David Worstell, Denver, Colo., Stephen E. Tinkler, Tinkler & Carwin, Denver, Colo., Stanley H. Marks, Jonathan L. Olom, Marks & Olom, Denver, Colo., Michael H. Bynum, Chrisman, Bynum & Johnson, P. C., Boulder, Colo., Robert Kendig, Denver, Colo., Daniel C. Hale, Miller & Gray, P. C., Boulder, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

CARRIGAN, District Judge.

In these three related cases, the United States charges the defendants with various degrees of involvement in sale and possession for distribution of cocaine which allegedly occurred on October 6, 1980. In case number 80–CR–281, defendants Jon Neet, William Neet, Frank Cuaron and David Van Omen are each charged with two counts of distributing cocaine and one count of conspiracy to distribute cocaine, and defendants Cuaron and Van Omen are also charged with possession with intent to distribute. In case number 80–CR–282, defendants William Neet and Jon Neet are each charged with one count of distribution of cocaine. In case number 80–CR–283, defendant Mary Miller is charged with one count of possession of cocaine with intent to distribute.

The various defendants filed numerous motions, which were briefed and argued at a lengthy hearing before this Court. There was an extensive evidentiary hearing on motions to suppress filed by defendants Cuaron, Van Omen and Miller.[1] At the conclusion of the hearing, the Court orally entered tentative findings and conclusions on all motions, but has concluded after further study and reflection that a supplementary written order is necessary to properly deal with the motions to suppress. To the extent that the instant order conflicts with the Court's earlier oral rulings, this written order controls.

*Background Facts.*[2]

The transactions which took place in this case were the result of combined activities of agents of the Drug Enforcement Administration (DEA) and police officers of the cities of Boulder, Denver, and Greeley, Colorado. On October 6, 1980, pursuant to earlier negotiations, two DEA agents met with William and Jon Neet, who are brothers, for the purpose of purchasing cocaine. At approximately 11:45 a. m. that day, at the Boulder Inn, in Boulder, Colorado, the Neets delivered a quantity of cocaine to the DEA agents in return for about $8,000 cash. Jon Neet then told the agents that he was to meet with his supplier shortly thereafter, and the parties negotiated for the purchase and delivery of additional cocaine.

The parties arranged to have the agents and William Neet remain at their respective rooms at the Boulder Inn, while Jon Neet would travel to his source to obtain the additional narcotics. Jon told the agents that he would take a circuitous route to the supplier's location, making sure that he was not followed. He stated that it was a matter of utmost importance to protect his supplier's identity, because the supplier was a "family man" whose reputation had to be protected.

1. Defendants Jon and William Neet filed "Motions to Join and Adopt" the motions filed by other defendants, which implicitly included the motions to suppress filed by Cuaron, Van Omen and Miller. At the suppression hearing, however, the Neets did not actively press any suppression arguments, and the Court does not deem any ruling necessary with regard to the Neets.

2. To the extent that matters stated in this review of the facts are disputed, this statement constitutes the Court's findings of fact based on the Court's review of the evidence.

Before Jon left the Boulder Inn, officers attached an electronic tracking device, or "bumper beeper," to his car. Surveillance agents followed Jon's car on a rather lengthy, circuitous journey through the Boulder area, but lost visual contact with the car at approximately 12:10 p. m. At about 12:30 p. m., with the aid of the bumper beeper, officers relocated Jon's car parked in front of a single-family residence at 6968 Sweetwater Court, in Boulder County (hereinafter simply referred to as "the house"). At approximately the same time, William Neet informed the agents at the Boulder Inn that he had received a telephone call from Jon, who had stated that he was then at his supplier's house. The officers placed the house under surveillance.

At approximately 1:00 p. m., the police observed a man later identified as the defendant Van Omen arrive and enter the house carrying an "oxblood" colored briefcase.

At 1:35 p. m., Jon left the house and proceeded on a more-or-less direct route back to the Boulder Inn. Just before 2:00 p. m. he delivered a large quantity of cocaine to the DEA agents. Jon and William were then promptly arrested. At about the same time, the officers watching the house saw a woman, later identified as Mary Miller, enter the house.

Officers continued surveillance of the house for an additional fifty-five minutes after the Neets were arrested, but they saw no further activity. At 2:55 p. m., two DEA agents and an officer from the Boulder Police Department went to the front door of the house. The door was ajar, and through the five or six inch opening one of the officers saw a woman walk by, going from one room to another. The officer pushed the door wide open, identified himself as a law enforcement officer, and entered the house. Other officers followed.

The second officer to enter the house, a DEA agent, looked up the stairway, which was situated adjacent to the entry way, and noticed the defendant Van Omen at the top of the stairs, in a short hallway. He saw Van Omen turn or nod his head toward the partially open door of a room on the second floor, whereupon the door to that room immediately closed. The agent drew his pistol, ran up the stairs and entered the room. There he found defendant Cuaron attempting to flush a large quantity of a white powdery substance, later identified as cocaine, down the toilet. The agent saw an additional quantity of the white substance, in crystals, lying on top of a dresser in the room, and the officer immediately seized it.

Meanwhile, other officers were in the process of securing the premises. They asked the other three people—Van Omen, Miller, and Mrs. Cuaron—to remain in the living room area. Other officers also entered from the rear of the house to be sure it was secured. Cuaron was subsequently brought downstairs and kept with the other three. None of the four was formally arrested at the time, but from the time the officers entered the residence until they left at approximately 7:30 that night, no one was permitted to leave the living room for any purpose without being accompanied by an officer. All were requested to give general identification information for completion of forms normally executed following an arrest.

After the arrest of the Neets, officers had immediately begun the process of preparing an affidavit in support of a search warrant for the house, and the statement of facts in the affidavit was supplemented with information obtained after the officers had entered the house for the purpose of securing it. Efforts to obtain a warrant were delayed considerably when the officers discovered that none of the district or county judges resident in Boulder were available because they all were out of town attending the annual State Judicial Conference. Eventually the officers had to travel to Longmont, where a retired judge issued the search warrant.

The warrant authorized a search of the premises at 6968 Sweetwater Court and "all persons located" there, for narcotics, any part of the money used to pay for the cocaine delivered by the Neets during the first transaction, and any documents tend-

ing to identify persons involved in the transactions. This warrant was executed by the officers shortly after 7:00 p. m. During the ensuing search, cocaine was found in defendant Miller's purse, and additional cocaine and narcotics paraphernalia were found elsewhere. Officers opened the oxblood-colored briefcase which Van Omen had carried into the house, and there discovered a large quantity of money, including marked bills which had been used to purchase cocaine from the Neets.

### Analysis of the Issues.

#### 1. Use of the Bumper Beeper.

A threshold issue is whether use of the bumper beeper on Jon Neet's car, which led the officers to the house, was an illegal "search" in violation of the Fourth Amendment, thus rendering its fruits—the subsequent search and seizures at the house—tainted. Since the United States concedes that the surveillance team lost visual contact with the car for approximately twenty minutes, it seems clear that the officers probably would not have found the car at the house without the beeper.

The Tenth Circuit has not decided whether the use of a tracking device in the manner involved in this case constitutes a "search" for Fourth Amendment purposes. *See United States v. Chavez*, 603 F.2d 143, 145 (10th Cir. 1979) (assuming, without deciding, that the use of a beeper does constitute a search). The Fifth Circuit has held that the use of beepers does constitute a search. *United States v. Michael*, 622 F.2d 744 (5th Cir. 1980); *United States v. Holmes*, 521 F.2d 859 (5th Cir. 1975) (equally divided court, *en banc*). The Eighth Circuit, on the facts of a particular case, has gone the other way. *United States v. Bruneau*, 594 F.2d 1190 (8th Cir. 1979).

■ This Court finds the reasoning of the Fifth Circuit case persuasive. In this case, however, as in *Chavez*, the issue need not be decided, because none of the defendants here asserting the invalidity of the use of the device has standing to raise the issue. The Supreme Court has recently made it quite clear that an illegal search violates only the rights of those who have a "legiti-mate expectation of privacy in the invaded place." *United States v. Salvucci*, —— U.S. ——, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980). *See also Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Defendants charged with crimes of possession no longer have "automatic standing," and may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated. *Id.*

■ Here the "invaded" property was the car. Defendants Miller, Van Omen and Cuaron have failed to establish any legitimate expectation of privacy that was invaded by placing the bumper beeper on Jon Neet's car. While they might never have been discovered absent the arguable invasion of Jon Neet's privacy, the possible violation of *his* rights cannot serve as the basis for exclusion of evidence against these other defendants.

#### 2. Warrantless Entry and Securing of the House.

■ "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639, 48 U.S.L.W. 4375, 4379 (1980). However, the courts have often recognized that a warrantless entry, at least for limited purposes, may be justified where there are exigent circumstances. *See, e. g., United States v. Erb*, 596 F.2d 412 (10th Cir. 1979). Where officers have reason to believe that fruits of a crime or other evidence may be destroyed before a warrant can be obtained, for example, they may enter a residence for the purpose of "securing" it while a warrant is being obtained. *Id.* This exception only applies, of course, if the officers have probable cause, together with the exigent circumstances, to justify their warrantless entry. *Id. See also Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In determining whether the circumstances here justified the officer's actions, this Court must "evaluate the circumstances as they would

have appeared to prudent, cautious, and trained officers." *United States v. Erb*, 596 F.2d at 419; *United States v. Brown*, 540 F.2d 1048 (10th Cir. 1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977).

■ In this case the Court is convinced that the officers had probable cause to believe that money from the cocaine sale, together with additional cocaine, were in the house, as well as persons involved in the transaction as either suppliers or couriers. Officers had followed Jon Neet to the house, with the aid of the bumper beeper. Neet had remained in the house for twenty to thirty minutes at a time when he was supposed to be picking up the narcotics for the pre-arranged sale to DEA agents. William Neet had told DEA agents that he had received a call from Jon who had stated that he was at the supplier's house, and Jon went directly from the house back to the Boulder Inn, where he immediately delivered cocaine. These facts, all established by the evidence presented at the suppression hearing, clearly gave the officers probable cause.

Other evidence also indicated that there were sufficient exigent circumstances to justify a warrantless entry. Although officers were attempting to obtain a warrant, their efforts were being delayed by circumstances beyond their control, as well as the normal time delays incident to preparation of an affidavit to support a warrant. Moreover, officers testified that in their experience in these types of narcotics transactions the participants would set up a system to let each other know, usually by telephone, whether everything had gone as planned. If no call is received, it may be taken as a signal to the others that an arrest has occurred, and that any remaining drugs should be destroyed. Given the delays in obtaining a warrant, together with the officers' experience in these types of transactions, it was reasonable and prudent for them to enter and secure the house when they did. Where circumstances such as these exist, officers are not required to forego actions which their experience teaches them are reasonably necessary for preserving the fruits or instrumentalities of a crime, or for the apprehension of participants. Therefore, the officers were justified in entering, under the circumstances presented here, for the limited purpose of securing the house until a warrant could be obtained.

■ The next question, then, is whether the officers exceeded the limited scope of their authority when they entered the house, detained all persons inside, and seized the drugs found in the upstairs bedroom. Obviously, they were authorized to do what was reasonably necessary to prevent the destruction of evidence, and their actions in proceeding upstairs for that purpose were both reasonable and necessary. One officer had seen the bedroom door suddenly close just after the police identified themselves, and thus it was reasonable to infer that someone in that room was doing something he desired to conceal from the officers. Therefore it was not unreasonable to enter the bedroom and prevent the defendant Cuaron from flushing cocaine down the toilet. Once lawfully in the room, moreover, the officer was entitled to seize the additional cocaine found in plain view on top of the dresser.

There is simply no indication in the record that the officers here involved attempted in any way to evade the warrant requirement in making the warrantless entry. The scope of the intrusion, once the officers were inside the house, was limited to acts necessary to maintain the status quo, and the officers were quite conscientious in so limiting themselves.

Finally, with regard to actions taken by the officers before obtaining a warrant, the defendants have argued that because of the nature and length of their "detention" before the search warrant was obtained, they were in fact "arrested" without probable cause or a warrant. Since the detention lasted longer and was more intrusive than the "investigative stop" permitted by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the defendants contend that their rights were violated and evidence obtained as the result of the illegal detentions should be suppressed.

There can be little doubt that in this case the persons at the house were "seized" within the meaning of the Fourth Amendment—that is, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). At least as to defendants Van Omen and Cuaron, however, the Court finds and concludes that the officers had probable cause to *arrest* them based on their actions when the officers first entered, and gave what one officer reasonably perceived to be a signal to Cuaron, who was out of the officer's sight, inside the bedroom. The officer's conclusion in that respect was bolstered by the fact that the bedroom door immediately closed. Therefore, Van Omen's act of signalling Cuaron, together with the officers' having seen Van Omen enter the house while Jon Neet was there, and the officers' subsequent discovery of Cuaron attempting to dispose of the drugs, sufficiently implicated Van Omen in the drug transaction to give the officers probable cause to arrest him. It is also worth noting that in light of the great care that Jon Neet had taken in protecting the security of the transaction, it was reasonable for the officers to conclude that a person arriving while Jon was at the house would not have been admitted if he were not in some way involved. *See United States v. Peep,* 490 F.2d 903 (8th Cir. 1974); *United States v. Pentado,* 463 F.2d 355 (5th Cir. 1972).

The officers had much less to go on with regard to defendant Miller, however. She did not arrive at the house until after Jon Neet had left to return to the Boulder Inn, and virtually nothing was known about her except that she was present in the house when it was secured. No circumstances known to the officers when they entered the house, or when they first detained her, indicated her involvement in drug dealing. In short, the officers had little or no evidence to justify detaining Miller for a time longer than reasonably necessary to obtain her identification and perhaps an explanation of her presence. Since she was not allowed to leave after

that was accomplished, the Court finds that she was thereafter under arrest and that her arrest was unlawful because based on neither probable cause nor an arrest warrant. Her statement explaining the contents of her purse is the fruit of the unlawful arrest, and, therefore, it must be suppressed.

### 3. *Validity of the Search Warrant.*

The defendants next contend that the search warrant which the officers eventually obtained was invalid because not based on probable cause. With respect to the premises, this argument requires little response. The affidavit presented to the Colorado district court judge who issued the warrant related the facts of the cocaine transaction with the Neets, the automobile surveillance which led the officers to the house, and the fact that cocaine had been found in the house when officers entered to secure it. In short, "the affidavit ... set forth facts and circumstances within the officer's knowledge supported by reasonably trustworthy information from which a [judge could] reasonably conclude the items sought [were] connected to the crime and located at the place indicated." *United States v. Williams,* 605 F.2d 495, 497 (10th Cir. 1979).

The warrant also stated, however, that the officers could search *all persons* at the house for the items being sought. In this regard, the warrant was overbroad, for the affidavit presented to the issuing judge stated nothing whatsoever regarding the two women—Mrs. Cuaron and defendant Miller—who were being detained at the house. Therefore the warrant was not valid insofar as it purported to authorize personal searches of these two women. The affidavit did relate that Van Omen and Cuaron—described as "white males"—had taken certain actions which gave reason to believe they were involved with the narcotics deal, but it did not give the issuing judge probable cause to permit a search of "all persons" at the house. In fact, the warrant—like the affidavit—makes no mention of the two women. In light of this

defect, the final question is whether the officers exceeded the scope of authority granted by the warrant to search the *premises*, only.

4. *The Search Pursuant to Warrant.*

The principal objections addressed to the search conducted under the warrant are raised by defendants Van Omen and Miller. Most of the evidence discovered pursuant to the warrant search was found in places reasonably considered part of the "premises." Therefore the admissibility of most of the evidence is not affected by the overbreadth of the warrant with regard to personal searches.

Van Omen, however, raises a particular objection to the search of his briefcase. It contained a large quantity of currency, including bills marked for use in the Neets' cocaine sale. Similarly, Miller objects to the search of her purse pursuant to the warrant. The purse contained cocaine. (As indicated above, Miller also seeks to suppress a statement she made immediately after the cocaine was discovered in her purse.)

The question of the extent to which a warrant to search premises permits a search of persons or personal belongings found there has been addressed in surprisingly few cases, and the answers have not been entirely clear. In *Walker v. United States*, 327 F.2d 597 (D.C.Cir.1963), the Court held that a wallet and a paper bag, passed by one occupant of the residence to another, were within the scope of a warrant to search the premises. The Court emphasized that the officers, who were searching for heroin, reasonably could have concluded that the items contained heroin, especially in light of the fact that the immediate reaction of one defendant, when the officers identified themselves, was to hand the items to the other defendant. The Court also noted that to hold otherwise on the facts of that case would be to enable persons to frustrate the purposes of a warrant to search premises simply by picking up the contraband and holding it in one's hand.

In *United States v. Teller*, 397 F.2d 494 (7th Cir. 1968), *cert. denied*, 393 U.S. 937, 89 S.Ct. 299, 21 L.Ed.2d 273 (1968), the search of a woman's purse on the basis of a premises search warrant was upheld. The Court in essence concluded that the purse did not continue to be an "extension of the women's person" when she put the purse down in one room and then left that room.

The First Circuit criticized the *Teller* approach in *United States v. Micheli*, 487 F.2d 429 (1st Cir. 1973), at least to the extent that *Teller* seemed to base the answer to the question solely on physical possession. The *Micheli* Court reasoned that the extent to which personal effects lie outside the scope of a premises search warrant depends on the "relationship between the person and the place." *Id.*, at 431.

"It should not be assumed that whatever is found on the premises described in the warrant necessarily falls within the proper scope of the search; rather, it is necessary to examine why a person's belongings happen to be on the premises. '[T]he Fourth Amendment protects people, not places', *Katz v. United States*, 389 U.S. 347, 352 [88 S.Ct. 507, 19 L.Ed.2d 576] . . . (1967), and the protective boundary established by requiring a search warrant should encompass those extensions of a person which he reasonably seeks to preserve as private, regardless of where he may be." *Id.*, at 432.

Thus, the *Micheli* Court distinguished between the "polar" cases of an occupant of a residence, who has no additional privacy interest in his or her belongings situated there, and the "mere visitor" in that residence, who retains an expectation of privacy in personal belongings regardless of whether he or she may have temporarily set them down. *Id.* With regard to cases falling between extremes, the Court decided that searches of the personal effects of visitors to premises should "be appraised by reference to the reasonable expectations of privacy" which the particular person has brought to the premises, rather than merely by referring to physical possession. *Id.*

In *United States v. Johnson*, 475 F.2d 977 (D.C.Cir.1973), the Court referred to the question of the scope of the invasion of privacy in searching a woman's purse pur-

suant to a warrant to search premises, but again seemed to base its holding—upholding the search—on the fact that at the time of the search the purse was not actually in the woman's possession. In light of that non-possession, apparently, the Court concluded that the invasion of privacy was not sufficient to justify suppression. As in *Walker*, the Court of Appeals for the District of Columbia Circuit placed considerable emphasis on the fact that overturning the search would frustrate the warrant's purpose. *Id.*, at 979.

Finally, the Court of Appeals for the District of Columbia Circuit has most recently considered this issue in *United States v. Branch*, 545 F.2d 177 (D.C.Cir. 1976). In *Branch*, the Court stated that the holdings of *Teller* and *Walker* had retained their vitality in that circuit, but then seemed to analyze the question in a manner related to that suggested by the First Circuit in *Micheli*. The *Branch* Court ruled that the search of a shoulder bag on the premises was *not* permissible where the owner of the bag was "apparently a mere visitor," and where his relationship to the premises "was not known, but was at best the subject of speculation." *Id.*, at 182. In addition, the Court noted that at the time of the search, the shoulder bag was suspended from the person's shoulder. Therefore, the Court concluded that under the reasoning of either line of cases the evidence seized from the bag should be suppressed. *See also United States v. Hilton*, 469 F.Supp. 94 (D.Me., N.D.1979).

■ In the instant case, neither Van Omen nor Miller was in physical possession of the subject "personal belongings" at the time those items were searched. This Court is persuaded, however, that mere physical possession is not the sole criterion which should determine whether a personal item may be searched pursuant to a premises search warrant. As the *Micheli* Court persuasively reasoned, and as the *Branch* Court may have implicitly acknowledged, there may be situations where a "mere visitor" may find his or her personal belongings subjected to a search of the premises, despite the fact that he or she has a legitimate expectation of privacy in those be-longings, and the mere fact that the person has set the belongings down may not always determine the reasonableness of a *continued* expectation of privacy.

■ Even applying the *Micheli* rationale to Van Omen's briefcase, the Court cannot conclude that Van Omen retained a legitimate expectation of privacy that placed the case beyond the scope of the warrant. Unlike the defendant in *Branch*, Van Omen was not a total stranger to the officers who happened onto the premises during the search. Prior to the search the officers had seen Van Omen enter the house at a time when Jon Neet was believed, on the basis of substantial evidence, to be picking up cocaine for delivery, and Van Omen had also implicated himself in Cuaron's efforts to destroy cocaine when the officers entered the house. Thus Van Omen was not a "mere visitor" who suddenly found his belongings vulnerable to a search of the premises. The Court finds and concludes that, under the circumstances, the showing of probable cause necessary for obtaining the warrant to search the house also reasonably encompassed a search of the briefcase carried into the house by the defendant Van Omen. Therefore the briefcase search was within the scope of the premises warrant.

■ As to Miller, however, the Court has reached the opposite conclusion, and therefore the Court here reverses its oral ruling from the bench with regard to this defendant. Nothing in the affidavit in support of the warrant, or in the knowledge of any of the officers, gave any indication of Miller's involvement in any narcotics transaction or other illicit venture. The officers did not know who Miller was or what her relationship to the premises was, if any. Unlike Van Omen, Miller did not arrive at the house while Jon Neet was there, so there was not the inference, as in Van Omen's case, that she could be involved as a courier. Under these circumstances, although the facts are not as compelling as those in *United States v. Branch*, the Court concludes that the authorities do not support its prior oral conclusion that the search of Miller's purse was authorized by the

premises search warrant. Moreover, since the statement made by Miller when the cocaine was discovered in her purse was elicited solely as the result of that discovery, her statement is suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Thus her statement is suppressed on two alternative grounds.

Accordingly, it is

ORDERED that Mary Miller's motion to suppress in number 80–CR–283 is GRANTED, and that the other motions to suppress are DENIED.