UNITED STATES of America, Plaintiff-Appellee,

v.

Frank Armando CUARON, Defendant-Appellant.

No. 81–1970.

United States Court of Appeals, Tenth Circuit.

Feb. 14, 1983.

---

Jonathan L. Olom of Marks & Olom, Denver, Colo., for defendant-appellant.

Brian G. McConaty, Sp. Asst. U.S. Atty., Denver, Colo. (Robert N. Miller, U.S. Atty., Denver, Colo., with him on brief), for plaintiff-appellee.

Before HOLLOWAY and SEYMOUR, Circuit Judges, and KELLY,* District Judge.

SEYMOUR, Circuit Judge.

Frank Cuaron was convicted on two counts of knowingly and intentionally distributing cocaine in violation of 21 U.S.C. § 841(a)(1) (1976)[1] and 18 U.S.C. § 2 (1976),[2] on a third count of conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846 (1976),[3] and on a fourth count of possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1). On appeal, Cuaron argues that evidence found by officers both in the initial warrantless search of his residence and in the subsequent search pursuant to a warrant should have been suppressed. We disagree with Cuaron and affirm the convictions.

I.

BACKGROUND

Cuaron's arrest stemmed from the combined investigative activities of Drug Enforcement Administration (DEA) agents and police officers from the cities of Boulder and Greeley, Colorado. The indictment charged Cuaron and co-conspirators Jon and William Neet and David Van Omen. Cuaron elected to waive his right to a jury trial and submitted his case to the district court on the record of the suppression hearing, a set of stipulated facts and exhibits, and the additional testimony of Jon Neet, who previously had pled guilty to one count of cocaine distribution.

As agreed in earlier negotiations for the purchase of cocaine, two undercover DEA agents met Jon and William Neet at the Boulder Inn at 11:45 a.m. on October 6, 1980. The Neets delivered approximately four ounces of cocaine to the DEA agents and received $8,000 cash in return. Jon Neet testified at trial that he had obtained this cocaine from Cuaron and had agreed to sell it for him.

Jon Neet told the agents at the Boulder Inn that he would be meeting with his drug supplier shortly thereafter. He also said

---

* Honorable Patrick F. Kelly, District Judge, District of Kansas, sitting by designation.

1. 21 U.S.C. § 841(a)(1) provides:
 "(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
 (1) to manufacture, distribute, or dispense or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . ."

2. 18 U.S.C. § 2 provides:
 "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 "(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

3. 21 U.S.C. § 846 provides:
 "Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

that his source had obtained three kilograms (about six and one-half pounds) of cocaine the night before, and that one kilogram had already been sold. The agents negotiated with Jon for the purchase and delivery of two additional pounds of cocaine. Jon explained that he could probably get only one pound of cocaine at a time from his supplier, but that if he returned to the supplier with the money he could obtain a second pound to sell. The Neets and the DEA agents agreed that William Neet and the agents would wait in their separate rooms at the Inn while Jon went to his supplier to acquire the cocaine. Jon explained to the agents that he would take a circuitous route to his supplier's location to ensure he was not followed. Jon also told them it was vitally important that he not reveal his supplier's identity because the supplier was a "family man" with a reputation to protect.

Before Jon left the Inn, officers attached an electronic tracking device to his car. The surveillance agents followed Jon to a shopping center where they lost contact with him for approximately ten minutes. Thereafter, using electronic tracking, the agents traced Jon's car to a single-family residence at 6968 Sweetwater Court in Boulder County, later identified as Cuaron's house.

At approximately 12:30 p.m., shortly after the agents observed Jon's car at Cuaron's residence, William Neet told the DEA agents at the Boulder Inn that he had just received a telephone call from Jon who said he was at the supplier's house. Cuaron's house was then placed under surveillance. At 1:00 p.m. Van Omen entered the Cuaron house carrying a briefcase. Jon testified that while at Cuaron's house, he and Cuaron discussed making an additional cocaine sale to the same purchaser. They agreed that Jon would sell a pound of cocaine for $32,000 and immediately return the money to Cuaron upon completion of the sale.

The agents followed Jon when he left Cuaron's house at 1:35 p.m. and returned by a circuitous route to the Boulder Inn. Shortly before 2:00 p.m., Jon delivered the pound of cocaine to the DEA agents at the Inn. Jon and William Neet were promptly arrested, and the agents immediately began efforts to obtain a warrant from state court to search the residence from which the cocaine had come. Surveillance of Cuaron's residence was continued. About forty minutes after the Neets were arrested, a decision was made to secure the residence without waiting for a search warrant. At 2:55 p.m., two DEA agents and a Boulder police officer went to the front door of the house. The door was ajar. An officer pushed it wide open, identified himself as a law enforcement officer, and entered the residence. Other officers then followed.

Upon entry, one of the DEA agents looked up the stairway to the second floor and noticed Van Omen at the top of the stairs. Van Omen nodded or turned his head toward a room on the second floor with its door slightly open. The door was shut immediately. The DEA agent drew his handgun, ran up the stairway, and entered the room. He found Cuaron trying to flush a substantial amount of white powder down the toilet. This substance was later identified as cocaine. The agent seized additional cocaine which he found lying in plain view on top of a dresser.

Cuaron and others in the house were detained in the living room. The officers secured the house and waited for a search warrant, which arrived four hours later at about 7:00 p.m. During the subsequent search, more cocaine and narcotics paraphernalia were found in the house.

## II.

### CONCURRENT SENTENCE DOCTRINE

Cuaron was sentenced to concurrent four-and-a-half-year terms of imprisonment under each of the four counts. The Government argues that the evidence obtained from searching the residence relates only to Count IV and that we should therefore affirm, applying the concurrent sentence doctrine. We decline to apply the doctrine and will address the suppression issues on the merits. See United States v. Montoya, 676 F.2d 428, 431–33 (10th Cir.1982).

## III.

### EXIGENT CIRCUMSTANCES AND WARRANTLESS ENTRY

Cuaron contends the trial court should have granted his motion to suppress because the warrantless search of the residence and seizure of certain items therein violated the Fourth Amendment. The crux of this assertion is that the police officers were not justified by "exigent circumstances" in foregoing the normal warrant requirement.

■ "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). Nevertheless, a warrantless entry for some limited purposes is permissible if police officers have probable cause to search the residence and exigent circumstances are present. *United States v. Erb,* 596 F.2d 412, 417, 419 (10th Cir.), *cert. denied,* 444 U.S. 848, 100 S.Ct. 97, 62 L.Ed.2d 63 (1979). Cuaron does not contend that probable cause was lacking in this case. Consequently, the only issue on appeal is whether exigent circumstances existed to permit the premises and individuals to be secured pending receipt of a search warrant.

■ The Government has the burden of establishing that exigent circumstances made the warrantless entry necessary. *United States v. Baca,* 417 F.2d 103, 106 (10th Cir.1969), *cert. denied,* 404 U.S. 979, 92 S.Ct. 347, 30 L.Ed.2d 294 (1971). In assessing whether the burden was met, we are "guided 'by the realities of the situation presented by the record.'" *United States v. McEachin,* 670 F.2d 1139, 1144 (D.C.Cir. 1981) (quoting *United States v. Robinson,* 533 F.2d 578, 581 (D.C.Cir.1976) (en banc)). We should "evaluate the circumstances as they would have appeared to prudent, cautious and trained officers." *Erb,* 596 F.2d at 419 (citing *United States v. Brown,* 540 F.2d 1048, 1055 (10th Cir.1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 548 (1977)).

■ When officers have reason to believe that criminal evidence may be destroyed, *id.* at 417–18, or removed, *McEachin,* 670 F.2d at 1144–45, before a warrant can be obtained, the circumstances are considered sufficiently critical to permit officers to enter a private residence in order to secure the evidence while a warrant is sought.[4] Cuaron argues, however, that no objective basis was present in this case for the police to believe criminal evidence was about to be destroyed or removed. He also contends that in any event the police had sufficient time to obtain a federal search warrant by telephone.

At the time the police and the DEA agents made the decision to secure the house prior to obtaining a search warrant, they were aware of the following facts: 1) after delivering the four-ounce sample of cocaine to the agents, Jon Neet had immediately returned to his supplier to deliver the $8,000 and pick up an additional pound of cocaine; 2) Jon called his brother from the supplier's house to report his arrival there; 3) the time necessary to travel round trip between the supplier's residence and the Boulder Inn, driving circuitously, was less than an hour; 4) after Jon delivered the pound of cocaine and received $32,000 for it, the plan was for him to return to the supplier to obtain an additional pound of cocaine to sell to the same purchaser. In addition, the officers knew that three kilograms of cocaine had arrived at the supplier's house the previous evening, that one kilogram had already been sold, and that the supplier wanted to sell it all as soon as possible. During the hour between Jon's arrest and the officers' entry of the house,

---

4. The dissent takes issue with this formulation, asserting that it "implies that any mere possibility, articulable suspicion or hunch that the evidence might be lost before a warrant arrives suffices to excuse a warrantless search." *Post* at 592. Instead the dissent proposes "that something near a realistic expectation that evidence will be lost if a warrant is sought should be required." *Id.* at 593. The contrast between the two tests is not sharp. By "reason to believe" we mean just that: *reason to believe.* Mere guesswork or whim will not do.

two vehicles arrived at the residence and two individuals left in other vehicles. The officers were also aware that the supplier was operating out of his house and was therefore very nervous about being discovered.

In the following exchange at the suppression hearing, Officer Diezi explained his decision to enter the house without a warrant:

"Q Now, an hour had already elapsed, *what made you believe that there were exigent circumstances* to make you hit the house before waiting for the warrant which you expected to arrive approximately two hours, three hours later?

"A We received information from Agent Barter that *people were starting to leave the house,* leave the residence, there were some comings and goings there. *The Neets had already been arrested and had not returned to the house, there was another pound transaction that was to take place. If everything had gone as planned they would have obviously been returning to that residence to complete the transactions which had been originally set up. So time, before their knowledge that something was wrong, was quickly going by.*

"Q And you knew, did you not, that the people were in the residence?

"A Yes, sir, we knew that, at least one subject was in the residence. Mr. Van Omen had entered and not exited that residence.

"...

"Q Lieutenant Diezi, if I can recall the last question that was asked of you, I believe it went that what were your reasons in believing that you had to get to the house realizing an hour had already elapsed, and thinking that the narcotics, et cetera, inside the house warranted this exigency of your breaking into the house?

"A *The fact that there was a future sale of drugs that was to take place, that the subject would return and—to the residence to return the money, and to pick up another package of cocaine, that if he* *did not return to the residence in a reasonable amount of time the drugs would be destroyed or removed.*

"Q Given the nature of cocaine, how easily is it destroyed and in what ways can it be destroyed?

"A *It can be very easily destroyed,* it can be flushed down a toilet, it can be flushed down a sink, it can be thrown out of a window, it can be carried out of the residence, just numerous ways in which it could be destroyed."

Rec., vol. III, at 71–72, 77 (emphasis added).

The officers also testified at the suppression hearing that they began proceedings to obtain a state court search warrant as soon as Jon was arrested. However, they knew it would normally take two to three hours to obtain such a warrant in Boulder. They testified that it was not ordinarily the practice of Boulder officers to apply to federal magistrates for warrants.

Because this investigation was a joint effort of state police and federal DEA agents, Robert Moren, the federal agent in charge, was asked why a federal warrant was not obtained. He replied that a federal warrant would have taken longer to obtain because they would have had to drive to Denver to get it. He did not consider a telephone warrant an option.

Based on these facts, the district court found that:

"Given the delays in obtaining a warrant, together with the officers' experience in these types of transactions, it was reasonable and prudent for them to enter and secure the house when they did. Where circumstances such as these exist, officers are not required to forego actions which their experience teaches them are reasonably necessary for preserving the fruits or instrumentalities of a crime, or for the apprehension of participants. Therefore, the officers were justified in entering, under the circumstances presented here, for the limited purpose of securing the house until a warrant could be obtained."

*United States v. Neet,* 504 F.Supp. 1220, 1225 (D.Colo.1981).[5] In determining whether exigent circumstances existed to excuse the failure to obtain a warrant, however, the trial judge did not assess the possibility of obtaining a federal warrant by telephone.

■ Under the Federal Rules of Criminal Procedure, federal magistrates are authorized to issue warrants based on telephone communications. Rule 41(c) provides:

"(2) *Warrant upon Oral Testimony.*

"(A) *General Rule.* If the circumstances make it reasonable to dispense with a written affidavit, a Federal magistrate may issue a warrant based upon sworn oral testimony communicated by telephone or other appropriate means.

"(B) *Application. The person who is requesting the warrant shall prepare a document to be known as a duplicate original warrant and shall read such duplicate original warrant, verbatim, to the Federal magistrate. The Federal magistrate shall enter, verbatim, what is so read to such magistrate on a document to be known as the original warrant.* The Federal magistrate may direct that the warrant be modified.

"(C) *Issuance.* If the Federal magistrate is satisfied that the circumstances are such as to make it reasonable to dispense with a written affidavit and that grounds for the application exist or that there is probable cause to believe that they exist, the Federal magistrate shall order the issuance of a warrant by directing the person requesting the warrant to sign the Federal magistrate's name on the duplicate original warrant. The Federal magistrate shall immediately sign the original warrant and enter on the face of the original warrant the exact time when the warrant was ordered to be issued. The finding of probable cause for a warrant upon oral testimony may be based on the same kind of evidence as is sufficient for a warrant upon affidavit.

"(D) *Recording and Certification of Testimony.* When a caller informs the Federal magistrate that the purpose of the call is to request a warrant, *the Federal magistrate shall immediately place under oath each person whose testimony forms a basis of the application and each person applying for that warrant. If a voice recording device is available, the Federal magistrate shall record by means of such device all of the call after the caller informs the Federal magistrate that the purpose of the call is to request a warrant. Otherwise a stenographic or longhand verbatim record shall be made.* If a voice recording device is used or a stenographic record made, the Federal magistrate shall have the record transcribed, shall certify the accuracy of the transcription, and shall file a copy of the original record and the transcription with the court. If a longhand verbatim record is made, the Federal magistrate shall file a signed copy with the court.

"(E) *Contents.* The contents of a warrant upon oral testimony shall be the same as the contents of a warrant upon affidavit."

Fed.R.Crim.P. 41(c)(2) (emphasis added).

The rule's legislative history demonstrates that Congress intended to encourage police to procure telephone warrants where "the existence of exigent circumstances is a close question and the police might otherwise conduct a warrantless search." *McEachin,* 670 F.2d at 1146; *see also* Fed.R.

---

**5.** The dissent expresses concern that "vague, speculative testimony of the sort given by Officer Diezi—and quoted at length by the majority—will be given much greater weight than it deserves." *Post* at 592. We do not see Diezi's testimony as "vague" and "speculative." The officers *knew* that another sale had been arranged, that the Neets—who had been in contact with the supplier—had been arrested, and that some people had entered and left the house. They also *knew* that cocaine was easily transported or destroyed. The very fact that we and the dissent view Diezi's testimony so differently serves as a reminder that we as appellate judges are in a poor position for evaluating witnesses' testimony. It is for the trial judge in the first instance to decide how much weight to give testimony. We quote Diezi's testimony because it shows support in the record for the trial court's finding of exigent circumstances.

Crim.P. 41(c)(2), Notes of Advisory Committee on Rules, 1977 Amendment, *reprinted in* 18 U.S.C. app. (Supp. IV 1980); S.Rep. No. 354, 95th Cong., 1st Sess. 10, *reprinted in* 1977 U.S.Code Cong. & Ad.News 527, 534.

The time necessary to obtain a warrant is relevant to a determination whether circumstances are exigent. Therefore, courts should consider the amount of time required to obtain a telephone warrant in assessing the urgency of the situation. *McEachin,* 670 F.2d at 1146. Although warrants obtained by telephone generally take less time to procure than traditional warrants, the time required for a telephone warrant varies from case to case. *See McEachin,* 670 F.2d at 1146–48; *United States v. Hackett,* 638 F.2d 1179, 1184–85 (9th Cir.1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); *United States v. Baker,* 520 F.Supp. 1080, 1083–84 (S.D.Iowa 1981). The exigencies of some situations will prevent the officers from obtaining even a telephone warrant. *McEachin,* 670 F.2d at 1146; *Hackett,* 639 F.2d at 1184–85.

■ In accordance with the congressional intent embodied in Fed.R.Crim.P. 41(c)(2), we conclude that trial courts must consider the availability of a telephone warrant in determining whether exigent circumstances existed, unless the critical nature of the circumstances clearly prevented the effective use of *any* warrant procedure. *McEachin,* 670 F.2d at 1147. Absent such clear exigency, the Government bears the burden of submitting evidence regarding the availability of a telephone warrant and the time necessary to obtain one.

Cuaron relies on *United States v. Baker,* 520 F.Supp. 1080 (S.D.Iowa 1981), to support his contention that the circumstances in this case were not sufficiently exigent to excuse the officers' failure to obtain a warrant by telephone. In *Baker,* DEA agents arranged to purchase drugs at a suspect's house, but the suspect decided to send his girlfriend to deliver the drugs at another person's house. The agents arrested the girlfriend when she brought the drugs, and then went to the suspect's house. The agents entered the suspect's house and arrested him without a warrant. The court held that the DEA agents could not use exigent circumstances as an excuse to forego a warrant because they had "abundant time" to obtain a telephone warrant. The court explained:

"At 3:00 p.m. or a few minutes thereafter, the agents had probable cause to arrest Southard, and they had reasonable grounds to believe that he might become alarmed and destroy evidence in his home and flee if Baker did not return to his home by about 4:45 p.m. Deducting the 25 to 30 minutes time required to travel from Wollner's home to Southard's home, *the agents still had nearly an hour and 15 minutes left in which to seek and obtain a warrant.* This was inadequate time to travel to Des Moines to get a warrant, but it was abundant time in which to seek and obtain a warrant from a federal magistrate by telephone.

" . . .

"Because the agents did not try to obtain a telephone warrant, for which there was abundant time, the government has failed to establish exigent circumstances."

*Id.* at 1083–84 (emphasis added).

Nevertheless, the court in *Baker* recognized there might be circumstances where "time constraints [would] not permit obtaining a warrant" at all. *Id.* at 1084. For example, in *McEachin* the officer involved was told by a confidential source that McEachin, nervous because one robbery suspect had been arrested, was "going to move" or "get rid of" the shotgun. 670 F.2d at 1141–42. Consequently, an immediate warrantless search of McEachin's apartment would have been justified even if a warrant by telephone had been readily available. *Id.* at 1148.

The defendant in *Hackett,* 638 F.2d at 1184, also asserted that there was sufficient time for officers to obtain a telephone warrant. However, the court noted that only twenty to thirty minutes elapsed between the time the agents following Hackett suspected he was heading for his residence and

the time the false-bottomed crate that had contained cocaine was opened in his garage. The court recognized this was insufficient time to procure a telephone warrant in compliance with Rule 41(c)(2).

 It is apparent from Rule 41(c)(2) that more than a simple telephone call is required in order to obtain a warrant based upon oral testimony. We conclude that the time constraints in this case justified the officers in proceeding without a warrant.[6] The agents had reasonable grounds to believe Cuaron might become alarmed and either destroy the additional cocaine or leave with the cocaine and the $8,000 if Jon did not return in the time necessary to travel to the Boulder Inn, make the transaction, and return to Cuaron's house with the money. *See Baker,* 520 F.Supp. at 1083; *see also People v. Williams,* 200 Colo. 187, 613 P.2d 879, 882 (1980) (en banc). Contrary to *Baker,* however, the circumstances here did not provide enough time to safely seek and serve a telephone warrant before evidence might disappear. At the time of Jon's arrest, the officers could not count on even thirty minutes to obtain a telephone warrant because it had taken Jon less time than that to return to Cuaron's house after completing the first transaction.

 When Agent Moren was asked why the agents did not attempt to get a telephone warrant, he explained: "We have discussed this before with the magistrates here. It's not really looked upon favorably .... [T]o my knowledge, there has never

been one in the judicial district ...." Rec., vol. III, at 182. Congress has clearly authorized magistrates to issue telephone warrants and it intended that they do so. Failure to seek a telephone warrant merely because "[i]t's not really looked upon favorably" will not be excused. Were the situation here less exigent, we would not hesitate to hold the warrantless search of Cuaron's house invalid.

 The fact that the officers eventually chose to wait until 2:55 p.m. to enter and secure the house does not affect our conclusion regarding exigent circumstances. Where probable cause and exigent circumstances exist, waiting to search does not necessarily remove the exigent circumstances even if the officers may have waited long enough to obtain a warrant. *See McEachin,* 670 F.2d at 1145; *United States v. Johnson,* 561 F.2d 832, 842, 844 (D.C.Cir.) (en banc), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2953, 53 L.Ed.2d 1080 (1977). Of course we do not here hold that the presence of exigent circumstances obviates the need for a warrant in any subsequent search, no matter how long delayed. We hold only that under these facts a warrantless search was justified even though the agents did not search Cuaron's house until about fifty-five minutes after the Neets' arrest. *G.M. Leasing v. United States,* 429 U.S. 338, 358–59, 361, 97 S.Ct. 619, 631–633, 50 L.Ed.2d 530 (1977), which the dissent cites to show that agents' failure to act at once can be evidence that the circumstances were not exi-

---

**6.** It is true, as the dissent notes, that the government presented no evidence of the time needed to obtain a telephone warrant. As a general rule the government must shoulder this burden. We emphasize that our holding is limited to the facts of this case. We do not hold that 30 minutes is never sufficient time to obtain a telephone warrant; we hold only that 30 minutes was inadequate time to obtain and serve a warrant under these circumstances. As the Second Circuit remarked in an analogous situation, "in law as in life, today's satisfactory explanation may be tomorrow's lame excuse.... [L]aw enforcement officials must be expected to learn from their own experiences and those of others." *United States v. Vazquez,* 605 F.2d 1269, 1280 (2d Cir.1979) (upholding admissibility of tapes recorded dur-

ing wiretaps despite certain delays in sealing), *cert. denied,* 444 U.S. 981, 1100 S.Ct. 484, 62 L.Ed.2d 408 (1979), 444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 649 (1980).

The dissent suggests that the agents actually had much more time to obtain a warrant because they had probable cause to search Cuaron's house as early as when Jon Neet left it at 1:35 p.m. *Post* at 594. At that time, however, the agents did not know whether Jon had in fact picked up the cocaine. Although they certainly would have had probable cause to search the house if they had arrested Jon on the spot with the cocaine on him, they did not in fact do that. We refuse to say that one or two agents should have sought a warrant *before* they had probable cause.

gent, involved a delay of *one and a half to two days,* clearly a different situation from the one here.

■ The district court also held that the evidence seized while the officers were securing the house was admissible. The court explained:

"The next question, then, is whether the officers exceeded the limited scope of their authority when they entered the house, detained all persons inside, and seized the drugs found in the upstairs bedroom. Obviously, they were authorized to do what was reasonably necessary to prevent the destruction of evidence, and their actions in proceeding upstairs for that purpose were both reasonable and necessary. One officer had seen the bedroom door suddenly close just after the police identified themselves, and thus it was reasonable to infer that someone in that room was doing something he desired to conceal from the officers. Therefore it was not unreasonable to enter the bedroom and prevent the defendant Cuaron from flushing cocaine down the toilet. Once lawfully in the room, moreover, the officer was entitled to seize the additional cocaine found in plain view on top of the dresser.

"There is simply no indication in the record that the officers here involved attempted in any way to evade the warrant requirement in making the warrantless entry. The scope of the intrusion, once the officers were inside the house was limited to acts necessary to maintain the status quo, and the officers were quite conscientious in so limiting themselves."

*Neet,* 504 F.Supp. at 1225. We agree with the court's reasoning.

■ Finally, because the initial entry to secure the premises was justified by probable cause and exigent circumstances, the evidence obtained through the issuance and execution of the search warrant, received after securing the premises, was also properly admitted into evidence.

AFFIRMED.

KELLY, District Judge, dissenting:

The majority opinion, to which I most respectfully dissent, holds that the warrantless entry and search of defendant Cuaron's home by seven armed law enforcement officers were justified because the exigencies facing those officers were so extreme that they dared not seek a warrant lest vital evidence of large-scale drug trafficking vanish in the meantime. For reasons expressed and explained herein, I believe that the majority's conclusions, as those of the trial court, are unfounded in fact and ignore relevant precedent and code. Moreover, I am convinced the majority, perhaps unknowingly, acquiesces in the law officers' evasion of certain established procedures relating to search and seizure, the thrust of which will surely signal some form of "excusable neglect" not remotely envisioned in the Fourth Amendment nor approved in *Weeks v. United States,* 232 U.S. 383, 393–94, 34 S.Ct. 341, 344–45, 58 L.Ed. 652 (1914). The admonition of this momentous decision has served us well. It is as pertinent and timely today as ever, if not more so. An application of its terms to this rather sensitive, provocative, and otherwise uncharted area of law makes the trial judge's decision quite simple. It serves as the rock on which my views are founded here:

The efforts of the courts and their officials to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their embodiment in the fundamental law of the land.... To sanction such proceedings would be to affirm by judicial decision a manifest neglect, if not an open defiance, of the prohibitions of the Constitution, intended for the protection of the people against such unauthorized action.

Today's decision will surely serve to further confuse this area of law. In my view, it will also serve to license future abuse and unnecessarily plague the courts. In light of these views, I would reverse defendant Cuaron's conviction and remand the case

for a new trial. Perhaps in the course of that proceeding the basis for my reservations could be more succinctly addressed and clarified.

In the interest of clarity, I will first address that with which I agree. In this regard, I find little fault with the majority's factual summary which, for the most part, parallels the findings of the trial court;[1] nor do I quibble with most of the majority's exposition of the applicable law. I agree that the government has the burden of proving that exigent circumstances made the warrantless entry "imperative," *Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971), or "necessary," *United States v. Baca,* 417 F.2d 103, 106 (10th Cir.1969), *cert. denied,* 404 U.S. 979, 92 S.Ct. 347, 30 L.Ed.2d 294 (1971);[2] and further agree that determining whether that burden is met requires us to evaluate the record's facts, as a whole, against the presumed benchmark responses of "prudent, cautious and trained officers," *United States v. Erb,* 596 F.2d 412 (10th Cir.), *cert. denied,* 444 U.S. 848, 100 S.Ct. 97, 62 L.Ed.2d 63 (1979). I agree that judging the necessity of foregoing a warrant demands some notion of the minimum time that would be exacted in procuring one, *United States v. McEachin,* 670 F.2d 1139, 1146 (D.C.Cir.1981); *United States v. Rubin,* 474 F.2d 262, 268 (3rd Cir.), *cert. denied* 414 U.S. 833, 94 S.Ct. 173, 38 L.Ed.2d 68 (1973), which in turn requires an understanding of how long it takes to obtain the telephonic search warrant authorized by Fed.R.Crim.P. 41(c)(2), since such a warrant

can generally be obtained more quickly than can the traditional kind, *United States v. Baker,* 520 F.Supp. 1080, 1083 (S.D.Iowa 1981).

While not necessarily pertinent to my reason for reversal, the factual basis giving rise to the decision-making process to "first secure the premises" also bothers me. In this regard, when the purported exigency arises from a mere threat that evidence will be lost,[3] I cannot agree that the relevant test is whether "officers have reason to believe that criminal evidence may be destroyed ... or removed ... before a warrant can be obtained," because such a "test" implies that any mere possibility, articulable suspicion or hunch that the evidence might be lost before a warrant arrives suffices to excuse a warrantless search, and all but guarantees that vague, speculative testimony of the sort given by Officer Diezi—and quoted at length by the majority—will be given much greater weight than it deserves. Of course, it is reasonable to guess that drug dealers—"family men" or not—get nervous when their couriers are delayed. They may indeed fear that the courier has been arrested; but they may also fear that he has been robbed by his customers, or that he has absconded with their drugs or money. Who knows which reaction is possible, or what the drug dealer's response will likely be? In the absence of any limiting objective evidence, a policeman's speculation as to what might occur is limited only by his imagination and his preconceptions—or, as officer Diezi might put it, his "experience."[4] An exception to the

---

1. I do find the majority's statement that upon the Neets' arrest "the agents immediately began efforts to obtain a warrant from state court" to be somewhat misleading. What actually happened is that within minutes of the arrest, but *after* the decision to "secure" Cuaron's residence had been made, the task of obtaining a warrant for a second, exhaustive search of the house was delegated to Boulder police officer Kurt Matthews. (Rec., Vol. III, at 62–64). Mr. Matthews began almost immediately to prepare the warrant affidavits, but he did not complete this task until after the house had been entered, so that the observations made by the securing officers might be included in the affidavits. Mr. Matthews made his

initial, fruitless attempts to contact a judge at "around 3:00 or 3:30." *Id.* at 191.

2. I do not, however, regard the quoted words as terms of art synonymous with "convenient."

3. The exigency might be heightened, of course, if that threat were coupled with a threat to the safety of the police or public, as in *Erb* or *McEachin,* but such is not the case here.

4. Officer Diezi admitted that he was unable to recall an instance where drugs had disappeared after the arrest of a courier; he explained, with presumably unconscious irony, that this was "because we secure the residence after the sale has taken place ... if we feel that there is *any*

Fourth Amendment's warrant requirement that may be established by a policeman's speculative fears can scarcely be described as "specifically established and well-delineated," *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967): it is better described as swallowing the rule.

I believe, rather, that evaluating a purported exigency requires an objective comparison between the likelihood, over time, that evidence will be lost and the likelihood that a warrant could not be timely obtained, if sought. I do not suggest that this comparison can be made with mathematical precision, and, of course, the level of tolerable risk of lost evidence will vary with a number of factors, as outlined, for example, in *Dorman v. United States,* 435 F.2d 385, 392–93 (D.C.Cir.1970), and in *United States v. Rubin, supra.* But where the crime involved is not violent, where the suspected criminals are not believed dangerous,[5] and where the doctrine of hot pursuit is not at issue, it is my view that something near a realistic expectation that evidence will be lost if a warrant is sought should be required. *See generally,* Comment, *Residential Searches to Prevent Destruction of Evidence: A Need for Strict Standards,* 70 J.Crim.L. & Crim. 255 (1979).

As relates to the entire process, I dearly believe that at all times material to the course of the law enforcement officers' activities—however diligent they may be—however rank the offense—these officers must also be equally mindful of the rights of the citizen. Simply stated, they must "think warrant!" Justice Jackson taught us best in *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), wherein, in part, he proclaimed as follows:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers. Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

Here, even if this record's indication of a risk of lost evidence went beyond the rankest form of speculation, it would be insufficient, because the trial court and all witnesses oddly measured the supposed risk by comparison with the several hours normally required to obtain a warrant from a state judge, and gave no consideration at all to the time required to obtain a telephone warrant. The *only* explanation on the record as to why a telephone warrant was not sought was given by DEA Special Agent Drew Moren:

> Q [By the Assistant United States Attorney] Agent Moren, you were attempting to explain why you didn't get an—attempt to get a telephone warrant; why didn't you?

*possibility* that drugs or the money will disappear." Rec., Vol. III, at 92–93 (emphasis added).

5. According to officer Diezi, when the officers initially entered defendant Cuaron's house to secure it, they did so with their weapons holstered, Rec., Vol. III, at 115. This alone negates the inference that the officers feared violence from anyone in the house.

A We have discussed this before with the magistrates here. It's not really looked upon favorably. I know one time Magistrate Sickler was going to allow one, a telephone warrant because of the geographical location where we were going to be. But we have never ever done it, you know, since then or before then, and to my knowledge, there has never been one in the judicial district, sir.

Rec., Vol. III, at 182.[6] I find the officers' response an inexcusable and hopefully unfounded one. The trial court's silence here is disturbing. Indeed, at least his curiosity should have invoked the kind of answers I would insist upon at the time of rehearing. Obviously, my prime objection to the majority opinion is that it is plain to me, that since the burden is on the government to establish exigent circumstances, the exigency in this or similar ones should only be established by comparison with the time required to obtain a telephone warrant. I am unwilling to accept the requisites of F.R.Crim.P. 41(c)(2) as some form of an option tendered solely for the investigating officers' convenience. Conversely, I believe its exercise, at least a timely attempt under these circumstances, is mandatory. Since no evidence whatsoever was introduced as to how long that time might be, let alone for a timely attempt, it follows that the action taken in this case falls to the presumption that warrantless searches are unreasonable under the Fourth Amendment.

The mere absence of evidence from which the necessary comparison can be made does not faze the majority; it simply pronounces that no delay at all could be brooked, since "the officers could not count on even thirty minutes to obtain a telephone warrant" from the time of Jon Neet's arrest. This declaration is insupportable for several reasons. First, the existence of an emergency that arose when Jon Neet was arrested is belied by the fact that agents chose not to commence the search until thirty minutes later. *Cf. G.M. Leasing Corp. v. United States,* 429 U.S. 338, 358–59, 97 S.Ct. 619, 631–32, 50 L.Ed.2d 530 (1977); *id.* at 361, 97 S.Ct. at 633 (Burger, concurring). Next, there is no evidence on the record that a telephone warrant would require as much as thirty minutes to obtain; it must be remembered that the investigation leading up to the search of defendant's house involved the simultaneous, coordinated actions of over *twenty* law enforcement officers, including more than a dozen DEA agents.

Consistent with my views, experience in similar proceedings suggests that at least one or two of these agents should have been (and probably were) assigned to the task of obtaining a telephone warrant. Typically, at such a time as when Neet's car is traced to the defendant's residence, and his entry confirmed, or certainly when Jon Neet called back to his brother, William, from the defendant's home, a magistrate should have been first called and simply alerted to "stand by." I am convinced from the record probable cause existed sufficient to support a warrant as early as when Jon Neet left the defendant's home at 1:35 P.M., but most assuredly at the time of the Neets' arrest at 2:00 P.M. Within minutes from either instance the noticed magistrate could have been recalled either from the motel or at a convenient site adjacent to the surrounded Cuaron premises, at which time a warrant would doubtless issue. Viewed in this light, the time frame is inconsequential.

Next, and as the teaching of *Weeks, supra,* remains the law of this Circuit, the telephonic search warrant procedures were precisely designed to accommodate law enforcement consistent with its rule. It does not envision good faith exceptions, but *compliance* as time permits. Accordingly, I cannot excuse the conduct of these other-

---

6. The majority's reason for quoting a portion of this testimony is none too clear: perhaps it wishes to establish that the decision to eschew a telephone warrant was made in "good faith." It has probably not escaped the majority that at oral argument below the sole argument raised by the government to excuse the officers' conduct was based on their purported "good faith," *see* Rec., Vol. IV, at 4; but if, in fact, the majority is adopting the holding of *United States v. Williams,* 622 F.2d 830 (5th Cir.1980) (en banc), it should state so plainly.

wise well-trained but overzealous federal agents for the failure to even attempt to timely obtain a telephonic warrant. I am disturbed, as I believe the trial judge should have been, by the fact that these officers were indeed aware of its availability but consciously ignored its usage. As "trained officers," I am also convinced they knew better. With this finding, in turn, I find that the officers consciously ignored the Fourth Amendment.

Regrettably, the majority correctly notes that the trial court did not assess the possibility of obtaining a warrant by phone. For the reasons stated, I am also convinced my colleague has erroneously ignored its constitutional implications.

Lastly, it would be a different matter if the only consequence of the majority's dissimulation were to make certain that this indisputably guilty defendant would be convicted of his crimes.[7] It is nonsense, however, to suppose that federal law enforcement officers will be impressed by the Supreme Court's and Congress's command that the telephonic search warrant procedure of Fed.R.Crim.P. be *used* in situations like this, *United States v. Baker,* 520 F.Supp. 1080, 1084 (S.D.Iowa 1981), when the majority's tacit message is that they need not bother. Conversely, if these well-trained officers would have simply followed the rules, and had the trial court enforced them, and this Court insisted upon compliance by both, the Fourth Amendment and the lessons in *Weeks* are preserved.

---

**7.** I believe that had the trial court correctly suppressed the evidence obtained through the search of defendant's home, defendant would still have been convicted on all four counts,