UNITED STATES of America, Plaintiff,

v.

Andrea Schipper BAKER, et al., Defendants.

Crim.No. 81–48.

United States District Court,
S. D. Iowa.

Aug. 26, 1981.

Roxanne Barton Conlin, U.S. Atty., Ronald M. Kayser, Asst. U.S. Atty., Des Moines, Iowa, for plaintiff.

Raymond Rosenberg, Rosenberg & Margulies, Des Moines, Iowa, for defendant Southard.

## RULING ON MOTION TO SUPPRESS

VIETOR, District Judge.

Defendant Southard's motion to suppress was heard by the court on August 21, 1981. Southard seeks to suppress all evidence acquired by the government as a result of his warrantless arrest on May 7, 1981, which was made in his own home after officers made a non-consensual entry, on the ground that the arrest violated his Fourth Amendment right to be free from unreasonable searches and seizures. The government admits that the arrest of defendant was without benefit of a warrant and was made in defendant's own home after a non-consensual entry, but defends the arrest on the ground that it was made with probable cause and under exigent circumstances.

FINDINGS OF FACT

The four defendants in this case are: Andrea Schipper Baker, Kimberly Sue Ditsworth, Loriss Southard, a/k/a Butch Southard, and Charles Thomas Wollner, a/k/a Chuck Wollner.

Wollner resides in State Center, which is located in the west central part of Marshall County, Iowa. Southard resides in a farm home in the northeast corner of Marshall County, about a 25 to 30 minute drive from Wollner's home. Baker is Southard's girlfriend and Ditsworth is Wollner's girlfriend.

In early May of 1981 Special Agent Alvin C. Overbaugh, of the Drug Enforcement Administration, was conducting an undercover investigation of Wollner. On May 6 Overbaugh purchased one ounce of cocaine from Wollner at his residence and there was discussion about getting more. In the forepart of the afternoon of Thursday, May 7, Overbaugh purchased almost eight ounces of cocaine and some marijuana from Wollner in his State Center residence, whereupon Overbaugh, with the assistance of other law enforcement officers,[1] arrested Wollner and Ditsworth.

Wollner, who had apparently obtained the controlled substances shortly before delivery to Overbaugh from a supplier living easterly of State Center, told the officers that Southard was his supplier. The agents asked Wollner to call Southard to make further arrangements. Wollner did so; at 2:55 p. m. he called Southard and told him that the buyers wanted to purchase more marijuana, and Southard said they could come to his place to get it. The agents, of course, intended to arrest Southard at the time of the planned transaction with him.

However, at about 3:00 p. m. or very shortly thereafter, Southard called back and told Wollner that he did not want them to come to his home and that he would send

---

1. Assisting Overbaugh in the events of May 7 were another DEA agent, three state Division of Criminal Investigation agents, a state high- way patrol trooper doing aerial surveillance, and later two more troopers on the ground.

his girlfriend, Baker, to Wollner's home to deliver the additional marijuana and pick up the purchase money for all of the transactions that had occurred that day. The agents decided to arrest Baker when she delivered the marijuana.

Overbaugh and DEA Special Agent Romaine Thornton then concluded that they had probable cause to arrest Southard and that there were exigent circumstances justifying them in arresting him in his home without a warrant, so Thornton and a state agent left State Center and proceeded to defendant Southard's home to make the arrest.[2] They arranged for two Iowa State Highway Patrol troopers to join and assist them. The four officers arrived in the vicinity of Southard's home about 25 to 30 minutes after their departure from State Center, and drove past the home and proceeded down the road a short distance where they parked for 15 to 20 minutes. About 4:00 p. m. they drove back to Southard's home, made a non-consensual entry into it and arrested Southard inside the home. Incident to the arrest they discovered and seized some evidence from the person and the home of Southard. Southard was given his *Miranda* rights and later he made some statements.

### Alleged Exigent Circumstances

The agents testified that at 2:55 p. m. they believed they had probable cause to arrest Southard and that a few minutes after 3:00 p. m., when Southard called to advise that Baker would be delivering the marijuana to Wollner's home, they knew that they had lost the opportunity to personally make a buy from him and arrest him at that time.

The agents testified that they expected that Southard would become suspicious that something had gone wrong with the drug transaction if Baker did not arrive back at his home after the lapse of the time necessary for her to drive from his home to Wollner's home, conduct the transaction, and return, and that he might then destroy evidence in the home and flee. Overbaugh testified that he figured Southard would expect Baker back about 4:45 p. m.

The agents testified that they did not have sufficient time to get a warrant and execute it before defendant would become suspicious and possibly destroy evidence and flee. They did not consider traveling to the nearest federal magistrate in Des Moines to obtain a warrant because the travel time from State Center to Des Moines and then back to Southard's residence was two hours or more. Overbaugh testified that he did not make telephonic application to a federal magistrate for a warrant under the provisions of Fed.R.Crim.P. 41(c)(2), explaining: "That takes almost as long. It decreases the driving time; but the time you still have to write the warrant, and there has to be certain procedures that you have to follow, which is time-consuming." The agents did not consider obtaining a warrant from a state judicial officer in Marshalltown, the Marshall County seat, because they assumed that they would have difficulty finding a state judge or magistrate there and that it would take two to three hours time to actually obtain a warrant once one was located.

### CONCLUSIONS OF LAW

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

■ The Fourth Amendment prohibits the police from making a warrantless and

---

2. After Thornton and the state agent left, Overbaugh made a telephonic report to Assistant United States Attorney Ron Kayser. Overbaugh testified that he believes he told Kayser that Thornton was on his way to arrest Southard. He does not recall if he mentioned that it would be a warrantless arrest, and he is not sure that they even discussed entering Southard's home to make the arrest.

non-consensual entry into a suspect's home in order to make a felony arrest, absent exigent circumstances. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The Court stated:

The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable Government intrusion." *Silverman v. United States*, 365 U.S. 505, 511 [81 S.Ct. 679, 682, 5 L.Ed.2d 734]. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Id.* at 589–90, 100 S.Ct. at 1381–82.

■ The law governing exigent circumstances justifying a warrantless arrest of a suspect in his own home need not be exhaustively canvassed. It is sufficient to note that officers may make a warrantless and non-consensual entry into a suspect's home to arrest him for a felony if they have probable cause to believe that he committed a felony and that he may destroy evidence or flee if arrest efforts are delayed for the time necessary to obtain a warrant. *United States v. Kulcsar*, 586 F.2d 1283 (8th Cir. 1978); *United States v. Titus*, 445 F.2d 577 (2d Cir. 1971); *Dorman v. United States*, 435 F.2d 385 (D.C.Cir.1970); *United States v. Tirinkian*, 502 F.Supp. 620 (D.N.D.1980).

■ At 3:00 p. m. or a few minutes thereafter, the agents had probable cause to arrest Southard, and they had reasonable grounds to believe that he might become alarmed and destroy evidence in his home

and flee if Baker did not return to his home by about 4:45 p. m. Deducting the 25 to 30 minutes time required to travel from Wollner's home to Southard's home, the agents still had nearly an hour and 15 minutes left in which to seek and obtain a warrant. This was inadequate time to travel to Des Moines to get a warrant, but it was abundant time in which to seek and obtain a warrant from a federal magistrate by telephone.

Fed.R.Crim.P. 41(b) expressly provides: "A warrant may be issued under this rule to search for and seize any person for whose arrest there is probable cause * * *."

Fed.R.Crim.P. 41(c)(2) provides:

Warrant upon oral testimony.—

(A) General Rule.—If the circumstances make it reasonable to dispense with a written affidavit, a Federal Magistrate may issue a warrant based upon sworn oral testimony communicated by telephone or other appropriate means.

(B) Application.—The person who is requesting the warrant shall prepare a document to be known as a duplicate original warrant and shall read such duplicate original warrant, verbatim, to the Federal magistrate. The Federal magistrate shall enter, verbatim, what is so read to such magistrate on a document to be known as the original warrant. The Federal magistrate may direct that the warrant be modified.

(C) Issuance.—If the Federal magistrate is satisfied that the circumstances are such as to make it reasonable to dispense with a written affidavit and that grounds for the application exist or that there is probable cause to believe that they exist, the Federal magistrate shall order the issuance of a warrant by directing the person requesting the warrant to sign the Federal magistrate's name on the duplicate original warrant. The Federal magistrate shall immediately sign the original warrant and enter on the face of the original warrant the exact time when the warrant was ordered to be issued. The finding of probable cause for a warrant upon oral testimony may be

based on the same kind of evidence as is sufficient for a warrant upon affidavit.

(D) Recording and certification of testimony.—When a caller informs the Federal magistrate that the purpose of the call is to request a warrant, the Federal magistrate shall immediately place under oath each person whose testimony forms a basis of the application and each person applying for that warrant. If a voice recording device is available, the Federal magistrate shall record by means of such device all of the call after the caller informs the Federal magistrate that the purpose of the call is to request a warrant. Otherwise a stenographic or longhand verbatim record shall be made. If a voice recording device is used or a stenographic record made, the Federal magistrate shall have the record transcribed, shall certify the accuracy of the transcription, and shall file a copy of the original record and the transcription with the court. If a longhand verbatim record is made, the Federal magistrate shall file a signed copy with the court.

(E) Contents.—The contents of a warrant upon oral testimony shall be the same as the contents of a warrant upon affidavit.

(F) Additional rule for execution.—The person who executes the warrant shall enter the exact time of execution on the face of the duplicate original warrant.

(G) Motion to suppress precluded.—Absent a finding of bad faith, evidence obtained pursuant to a warrant issued under this paragraph is not subject to a motion to suppress on the ground that

the circumstances were not such as to make it reasonable to dispense with a written affidavit.

Overbaugh's testimony that obtaining a warrant by telephone would have taken almost as long as driving to Des Moines to obtain one personally is simply not credible. It was during working hours on a weekday. United States Magistrate Ronald Longstaff's office and my office are, and were then, equipped to record a telephone conversation. The conversation would not take long nor would filling out the search warrant form blanks. The whole process would probably not have taken more than 20 minutes, 30 at the most.

The Supreme Court and Congress adopted the telephonic search warrant procedure to accommodate the very situation presented by this case. It is to be used.

■ If an effort to obtain a telephonic warrant is unsuccessful because a federal magistrate cannot be reached or if one is reached and he cannot make a verbatim record of the phone conversation, a warrant should then be sought from a nearby state judicial officer if time permits.[3] Of course, if time constraints do not permit obtaining a warrant, then the arrest may be made under the exigent circumstances exception to the warrant requirement.[4]

■ Because the agents did not try to obtain a telephone warrant, for which there was abundant time, the government has failed to establish exigent circumstances. Therefore, defendant Southard's motion to suppress is sustained on the ground that

3. Because the failure of the agents to seek a telephonic warrant from a federal magistrate is dispositive of the motion to suppress, I do not decide if there was time to obtain a warrant from a state judge or magistrate in Marshalltown. It should be noted, however, that the government cannot prove that there would have been difficulty in locating one simply by assuming that such difficulty would be encountered, especially during weekday working hours. Also, I think the government's estimate of two to three hours time to get a warrant in Marshalltown is exaggerated. That may be the amount of time it usually takes to get a warrant under normal, unrushed circumstances,

but under time constraints a warrant can be obtained in significantly less time. I have seen it done. If it develops that the process is in fact taking too long, it can be broken off and a warrantless arrest can then be made under exigent circumstances.

4. In every case relied on by the government (most of which involved events before adoption of the telephonic warrant procedure), lack of ready availability of a magistrate was a factor establishing exigent circumstances. In most cases, the need for a prompt arrest arose on a Sunday or at night, rather than during working hours on a weekday.

defendant's warrantless arrest in his own home violated his Fourth Amendment right to be secure from unreasonable searches and seizures, and the evidence seized from him and his home on the occasion of his arrest and the statements made by him subsequent to his arrest are inadmissible as evidence against him in this case. *Payton v. New York, supra; Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).