**Jamie SPENCER, Plaintiff,**

v.

**CITY OF BAY CITY, Defendant.**

**No. 02–10280–BC.**

United States District Court,
E.D. Michigan,
Northern Division.

Nov. 18, 2003.

Kary L. Moss, Michael J. Steinberg, David A. Moran, Detroit, MI, William T. Street, Saginaw, MI, for plaintiff.

Ethan Vinson, Cummings, McClorey, Livonia, MI, for defendant.

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

LAWSON, District Judge.

This case involves a challenge to the constitutionality of a Bay City, Michigan ordinance that allows police officers, upon reasonable suspicion, to demand that a person who has not reached 21 years of age take a breath test, without first having obtained a search warrant. This matter is before the Court on the plaintiff's motion for partial summary judgment and on the defendant's motion to dismiss or for summary judgment. The parties agree that a preliminary breath test constitutes a "search" within the meaning of the Fourth Amendment. The Court finds that the purpose of the authorization contained in the ordinance is to gather evidence of a criminal violation, and thus concludes that the ordinance's blanket authorization of warrantless searches is repugnant to the Fourth Amendment to the Constitution. The defendant's motion to dismiss or for summary judgment, therefore, will be denied, and the plaintiff's motion for partial summary judgment will be granted.

## I.

The local ordinance that is the focus of this litigation is Section 10–57 of the Bay City Code of Ordinances (B.C.Ord. § 10–57). That ordinance makes unlawful the attempt or actual purchase, possession, and consumption of alcoholic beverages by persons under 21 years of age. The ordinance declares such conduct a misdemeanor and establishes a schedule of fines and other sanctions for first and subsequent convictions. B.C. Ord. § 10–57(a). The ordinance also punishes any person who furnishes alcohol to a minor, and directs the Michigan Secretary of State to suspend the driver's license of violators. *Id.* § 10–57(b), (d). There is also a provision requiring the notification of parents in certain circumstances, *id.* § 10–57(f), and there are exceptions set forth as well. *Id.* § 10–57(g), (i), (j), (k). The subsection called into question in this case is Subsection (e), which states:

> A peace officer who has reasonable cause to believe a person less than 21 years of age has consumed alcoholic liquor may require the person to submit to a preliminary chemical breath test analysis. A peace officer may arrest a person based in whole or in part upon the results of a preliminary chemical breath analysis. The results of a preliminary chemical breath analysis or other acceptable blood alcohol tests are admissible in a criminal prosecution to determine whether the minor has consumed or possessed alcoholic liquor. A person less than 21 years of age who refuses to submit to a preliminary chemical breath test analysis as required in this subsection is responsible for a state civil infraction and may be ordered to pay a civil fine of not more than $100.00.

B.C. Ord. § 10–57(e), Pl.'s Mot. S. J., Ex. A. This subsection of the ordinance is patterned after a similarly-worded Michigan statute, *see* Mich. Comp. Laws § 436.1703(5), which the plaintiff does not

challenge here. The parties agree that a Bay City police officer demanded that the plaintiff submit to a breath test on the authority of the local ordinance.

At about 6:30 p.m. on August 20, 2001, the plaintiff, Jamie Spencer, who was 19 years old at the time, left work and drove to the home of her fiancé, Van Spencer. The two discussed going to a location in Bay City to "roller blade," and invited Ashley Ball, Van Spencer's cousin, and Timothy Kolka, the plaintiff's friend, to join them. Spencer Dep. at 10, Pl.'s Mot. S. J., Ex. D. The plaintiff, Van Spencer, and Ball drove to Bay City in Van Spencer's car and parked at the Veterans Memorial Park in downtown Bay City, arriving at approximately 8:30 p.m. *Ibid.* At the park they met Kolka and two of Kolka's friends, Eric Tweddle and Matt McDaniel. *Id.* at 16. All six individuals left the park and went roller blading around the city. At approximately 11:30 p.m., they returned to the park. *Id.* at 16–17.

Shortly thereafter, Bay City police officers Rod Schanck and Brian Schroer were dispatched to the park after the police received a report of a disturbance and a possible fight near the boat launch area. Schroer Dep. at 11, Def.'s Mot. S. J., Ex. 2. Officer Schanck arrived at the park at approximately 12:03 a.m. on August 21, 2001. Def.'s Mot. S. J., Ex. 1 (Police Report). Upon entering the park, he observed an individual on roller blades, later identified as Eric Tweddle, standing next to two vehicles near the park entrance. Schanck said that Tweddle appeared to be a juvenile. He also noticed two other vehicles parked near some tennis courts in the park and four individuals, later identified as the plaintiff, Van Spencer, Ball, and Kolka, standing next to those vehicles.

Schanck drove around the park and, after not finding any evidence of a disturbance, returned to the entrance way where

Tweddle was still standing. The two vehicles that were near the entrance way had departed by this time. Schanck testified that he approached Tweddle to inform him that the park closed at 10:00 p.m., and as he did, he "could smell a lot of intoxicants" coming from Tweddle. Schanck asked Tweddle if he had been drinking. Schanck Dep. at 20, Def.'s Mot. S. J., Ex. 3. Tweddle denied that he had been drinking; Schanck then read him his preliminary breath test (PBT) rights from a laminated card that Bay City police officers customarily carry with them. Upon being read his rights, Tweddle agreed to take a breath test.

Schanck explained that standard PBT protocol requires that an officer engage in a 15–minute "observation period" before taking a breath sample, during which the officer monitors the individual and checks the individual's mouth to make sure nothing is inside that would block the test or damage the machine. *Id.* at 20–21. Consequently, Schanck placed Tweddle in the back of his patrol car to wait before he administered the PBT.

While Tweddle was sitting in the back of the patrol car, Officer Schroer arrived at the park. With Schroer next to him, Schanck administered the PBT to Tweddle. The test revealed that Tweedle had a .09% blood-alcohol concentration level. *Id.* at 20. Schanck wrote Tweddle a citation for violating B.C. Ord. § 10–57(a). The officers then asked Tweddle if he knew the four individuals that were standing next to the cars parked by the tennis courts. Tweddle said that he had arrived at the park with those individuals. *Id.* at 22. The officers left Tweddle in the patrol car and walked over to the group to talk to them. Schanck testified as follows:

Q. You certainly did not believe that you had reason to believe that everybody standing in that group had consumed alcohol because Mr. Tweddle had flunked a PBT, do you?

A. Well, normally if you have a group of kids that are together and if one of them's been drinking, it's reasonable to consider that all of them may have been.

Q. You considered it a reasonable inference?

A. Yes, yes.

Q. So part of your purpose in approaching the group was simply because Eric Tweddle has said he had come with these people you intended to go over and see if there was any other evidence of alcohol among that group?

A. That was part of our reason for going over there.

Q. What other part or parts did you have in approaching this group?

A. Well, we—they were in the park after the curfew. I wanted to speak to them about that. And we also wanted to inquire about if they saw the fight, if there was a fight if they were involved or anything to do with the fight.

*Id.* at 23–24.

The group, consisting of the plaintiff, Van Spencer, Ball, and Kolka, told the officers that they had no knowledge of a fight. Officer Schroer testified at this deposition that "in speaking with the group I recall observing or smelling an odor of intoxicants coming from one of the individuals or possibly the group, it was tough to tell being as it was they were lined up in front of us and we were speaking to them." Schroer Dep. at 15, Def.'s Mot. S. J., Ex. 2. Schroer also testified that there was no alcohol visible. *Id.* at 19. The officers then asked the group for identification and Officer Schroer ran their names through the Law Enforcement Information Net-

work (LEIN) system to check for "wants and warrants." *Id.* at 16–17. The system reported that Timothy Kolka had an outstanding warrant for failure to appear in court. *Id.* at 17. The other individuals did not have any outstanding warrants.

Meanwhile, Officer Schanck read the plaintiff, Ball, and Kolka their PBT rights. Van Spencer was not read these rights as it was determined from his identification card that he was 21 years old. Schanck Dep. at 21, Def.'s Mot. S. J., Ex. 3. Schanck testified as follows:

Q. Do you recall any of the people out of the group specifically asking you what happens if we refuse to take [the PBT] or what happens if we don't take it?

A. I remember being asked that, yes. I don't recall which ones asked it. I think it was kind of a group question.

Q. Okay. And when that sort of question was posed what answer did you give to it as to what the consequences were for refusing to blow into the PBT?

A. I explained to them that they would be given a ticket with a civil infraction where the fines were up to a hundred dollars.

Q. Was there any implication in your response that they could be arrested for refusing to take it?

A. No.

*Id.* at 27–28.

The plaintiff and Ball agreed to take the PBT and both "registered negative" for alcohol consumption. *Id.* at 29. Kolka, however, refused to take the PBT. After Schroer told Schanck that Kolka had an outstanding warrant, the officers attempted to arrest Kolka. Kolka resisted and Officer Schroer, in attempting to place handcuffs on Kolka, struck Kolka in the leg with his knee several times until Kolka finally permitted the handcuffs to be placed on him. The plaintiff and the others in her group voiced their objections to the police officers' conduct and Schroer took out his pepper spray in response. The group quickly calmed down. Schroer Dep. at 25, Def.'s Mot. S. J., Ex. 2. Kolka was given citations for refusal to take the PBT, being a minor in possession of alcohol, and for being in the park after 10 p.m. *Id.* at 20.

After Kolka was taken into custody, the officers returned the identification cards and told the plaintiff, Van Spencer, and Ball that they were free to leave. The officers did not issue any citations to the three individuals for being in the park after it closed. *Id.* at 26. The plaintiff testified that the entire encounter lasted "anywhere from 45 minutes to an hour and 15." Jamie Spencer Dep. at 33, Pl.'s Mot. S. J., Ex. D. Officer Schroer estimated that the entire incident lasted 20 to 25 minutes. Schroer Dep. at 21, Def.'s Mot. S. J., Ex. 2. However, 90 minutes elapsed from the time the officers arrived in the park until they left the park. *Ibid.*

The police officers stated that the practice of demanding PBT's from persons under 21 years of age is consistent with municipal policy. Officer Schroer testified as to his understanding of the City's policy as follows:

Q. And in general, what was your understanding of the basis on which you could require an individual whom you knew was under the age of 21 to be required to submit to a preliminary breath test?

A. With reasonable cause of knowing the person is under age, having reasonable cause to believe they have consumed or possess alcohol, therefore, you're permitted, so to speak, to offer the PBT test.

Q. And according to your training what is the consequence of a refusal?

A. Refusing to submit to the PBT is a civil infraction, a fine of up to one hundred dollars.

Q. And it was your understanding from your training that there was no consequence of arresting the individual if they refused a PBT test?

A. They—we were not to arrest at all.

Q. Also was it the standard policy of the department that if an individual flunked a PBT test, or let us say registered positive for alcohol, they were to be issued a citation?

A. Right. By you saying flunked you mean over point zero two or higher?

Q. Yes.

A. Yes, they would be issued a citation or if they were a juvenile they would be—we don't issue citations to juveniles. A petition request is completed.

Q. That would go to the probate court?

A. Yes.

*Id.* at 8–9.

The plaintiff filed her complaint in this Court on the basis of 42 U.S.C. § 1983, alleging that Section 10–57(e) of the Bay City Code of Ordinances is unconstitutional, as is Bay City's policy and practice requiring individuals who are twenty years old or younger to take "breathalyzer" tests to measure alcohol consumption without first seeking a search warrant. In addition to a declaration of the unconstitutionality of the ordinance and the City's policy and practice, the plaintiff seeks a declaration that her Fourth Amendment rights were violated, money damages, and costs and attorney fees under Section 1988. The parties filed their cross motions for dispositive relief, and the Court heard oral argument on the motions on October 8, 2003.

## II.

Both the plaintiff and the defendant have moved for summary judgment; neither has argued that there are material facts in dispute. Rather, each party claims entitlement to a judgment in its favor as a matter of law. "By its very nature, a summary judgment does not involve the determination of disputed questions of fact, but is confined to purely legal issues." *Eisenmann Corp. v. Sheet Metal Workers Intern. Ass'n Local No. 24, AFL–CIO*, 323 F.3d 375, 380 (6th Cir.2003) (citing Fed.R.Civ.P. 56(c) (summary judgment may be granted only if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law") and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine issue of material fact. *Simmons–Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir.2000). When this Court evaluates cross motions for summary judgment, it "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506–07 (6th Cir.2003).

It is undisputed that the defendant's police officers demanded a breath sample from Jamie Spencer in accordance with the City's policies and practices; that policy is reflected in the ordinance, which author-

izes police officers to take breath samples from persons under 21 years of age without first obtaining a warrant issued by a judicial officer allowing them to do so. The City defends this practice by claiming that the so-called "special needs" exception excuses the requirement for a search warrant, and the searches are reasonable because they are based on reasonable suspicion. The City also contends that the warrantless searches called for by the ordinance are justified by exigent circumstances, due to the length of time required in Bay City to obtain a search warrant for breath samples.

■ It is well established that the taking of a breath sample to test for the presence of alcohol constitutes a search under the Fourth Amendment. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 616–617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (holding that "[s]ubjecting a person to a breathalyzer test, which generally requires the production of alveolar or 'deep lung' breath for chemical analysis, implicates similar concerns about bodily integrity and ... should ... be deemed a search") (citations omitted). As such, the search must be reasonable. U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...."); *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (observing that "[a]s the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is 'reasonableness'"). Although there is a preference expressed in the Fourth Amendment that searches, to be reasonable, be sanctioned by the issuance of a warrant by a neutral and detached judicial officer, *see Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948), the Supreme Court has made it clear that not all searches need be authorized by warrant issued upon probable cause. *See Vernonia School Dist.,* 515 U.S. at 653, 115 S.Ct. 2386 (concluding that "a warrant is not required to establish the reasonableness of all government searches; and when a warrant is not required (and the Warrant Clause therefore not applicable), probable cause is not invariably required either").

One exception to the search warrant requirement carved out by the Supreme Court is found "when 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'" *Griffin v. Wisconsin,* 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 351, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (Blackmun, J., concurring in judgment)). Bay City contends that its ordinance accommodates a special need to address the problem of under-age drinking, and therefore the City is allowed to dispense with the requirement of obtaining a search warrant when demanding PBT samples from persons under 21 years old. This argument calls for an examination of the origin and scope of the "special needs" exception.

### A.

■ The Supreme Court first developed the special needs exception in *New Jersey v. T.L.O., supra.* That case arose in a public school setting; a 14–year–old high school freshman challenged the legality of the search of her purse by a school official who suspected her of smoking in school. The search, conducted without a warrant, yielded evidence of marijuana possession and trafficking, and led to delinquency proceedings against the student. The Supreme Court rejected the claim that searches by school officials must be assessed under the same standards as searches conducted by the police during

criminal investigations. Rather, the Court found that the need of public school officials to "maintain[ ] security and order in the schools requires a certain degree of flexibility in school disciplinary procedures." *T.L.O.*, 469 U.S. at 340, 105 S.Ct. 733. The Court concluded, therefore, that the "reasonableness" clause of the Fourth Amendment, not its "warrants" clause, governed. Consequently, the Court declared "that school officials need not obtain a warrant before searching a student who is under their authority," because "the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search." *Ibid.* Since the "warrants" clause was not applicable in this non-criminal context, the probable cause requirement for search warrants did not apply either. Instead, the Court held "that the accommodation of the privacy interests of schoolchildren with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 341, 105 S.Ct. 733.

Cases that followed *T.L.O.* have expounded on the circumstances when a search by government officials may be reasonable despite the failure to obtain a search warrant. One might conclude from reviewing the decisions issued since then that "practically any proper governmental purpose, other than law enforcement, is sufficient to constitute a special need, triggering balancing between the governmental interests and the individual's privacy interests." *See International Union, United Auto., Aerospace and Agr. Implement Workers of America v. Winters*, 278 F.Supp.2d 880, 883 (W.D.Mich.2003). For instance, "special needs" have been found

to justify a public employer's search of an employee's desk, *O'Connor v. Ortega*, 480 U.S. 709, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987); a probation officer's warrantless search of a probationer's home, *Griffin v. Wisconsin, supra*; drug testing of railroad employees involved in train accidents, *Skinner v. Railway Labor Executives' Ass'n, supra*; drug testing of employees of the Customs Service who apply for positions directly involving interdiction of illegal drugs or positions requiring the agent to carry firearms, *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); drug testing of student athletes in an effort to prevent the spread of drugs among the student population, *Vernonia Sch. Dist. 47J v. Acton, supra*; and drug testing of students who participate in competitive extracurricular activities, *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002).

The Supreme Court has also allowed searches for certain administrative purposes without particularized suspicion of misconduct, provided that those searches are appropriately limited. *See e.g., New York v. Burger*, 482 U.S. 691, 702–704, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (warrantless administrative inspection of premises of "closely regulated" business); *Michigan v. Tyler*, 436 U.S. 499, 507–509, 511–512, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (administrative inspection of fire-damaged premises to determine cause of fire); *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 534–539, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (administrative inspection to ensure compliance with city housing code). The Court has also upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens, *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49

L.Ed.2d 1116 (1976), and at a sobriety checkpoint aimed at removing drunk drivers from the road, *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990). In addition, in *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Court suggested that a similar type of roadblock with the purpose of verifying drivers' licenses and vehicle registrations would be permissible.

The Sixth Circuit has held that a school district has a special need to test for drug and alcohol consumption all applicants for all safety-sensitive positions in a school district, *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 158 F.3d 361 (6th Cir.1998); that a city has a special need to test its municipal bus drivers, *Tanks v. Greater Cleveland Reg'l Transit Auth.*, 930 F.2d 475 (6th Cir.1991); and that a city has a special need to test its firemen and policemen, *Penny v. Kennedy*, 915 F.2d 1065 (6th Cir.1990). In all of these cases, the courts have judged the search's lawfulness not by a standard characterized as "probable cause" or "reasonable suspicion," but by "the standard of reasonableness under all of the circumstances." *O'Connor*, 480 U.S. at 725–26, 107 S.Ct. 1492. This is consistent with the Supreme Court's general approach of determining that "[w]hat is reasonable ... 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'" *Skinner*, 489 U.S. at 619, 109 S.Ct. 1402 (quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985)).

In none of these cases, however, has the primary purpose of the search been the enforcement of criminal laws or the gathering of evidence. There is nothing "special" in the need of law enforcement to detect evidence of ordinary criminal wrongdoing; even where crime is on the rise and the disorder and insecurity caused by criminal behavior in a community is grave, the Supreme Court has consistently held that "the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose." *City of Indianapolis v. Edmond*, 531 U.S. 32, 42, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). "Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, th[e Supreme] Court has said that reasonableness generally requires the obtaining of a judicial warrant." *Vernonia School Dist.*, 515 U.S. at 654, 115 S.Ct. 2386.

Bay City contends that one of the main purposes of the ordinance is to stem the pernicious trend of increased under-age drinking, and to protect the public from the damage that can be caused by young people under the influence of alcohol. The Court agrees that there is a strong interest in preventing "harms associated with the use of alcohol by persons lacking the maturity necessary to do so responsibly" and "to reduce underage drinking and, by extension, the fatalities and serious injuries caused by teenage drunk driving." *In re Stark*, 250 Mich.App. 78, 82, 645 N.W.2d 340, 342 (2002) (citing Michigan House Legislative Analysis, H.B. 4136, August 16, 1995). The fact remains, however, that the principal purpose of B.C. Ord. § 10–57(e) is to gather evidence in aid of a criminal prosecution. That purpose is evident from the ordinance's plain language, which states: "the results of a preliminary chemical breath test analysis or other acceptable blood alcohol tests are admissible in a criminal prosecution to determine whether the minor has consumed or possessed alcoholic liquor." B.C. Ord. § 10–57(e).

That there may also be another purpose behind the law, which might be character-

ized as a "special need," does not shelter the ordinance from demands of the Fourth Amendment's warrant requirement. The Supreme Court made clear in *Ferguson v. City of Charleston,* 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001), that laudable, non-criminal purposes of a law authorizing warrantless searches will not exempt the practice from the traditional mandate of a warrant issued upon probable cause when an objective to gather evidence also exists. In that case, a municipal hospital had adopted a practice of conducting tests on urine samples of pregnant women to look for the presence of cocaine. Positive test results were used for diagnostic purposes, but they also were turned over to the police. The Court held that the tests constituted unreasonable searches under the Fourth Amendment. In answering the hospital's argument that the tests were justified by its special need to address problems of drug abuse in pregnant mothers, the Court stated:

> While the ultimate goal of the program may well have been to get the women in question into substance abuse treatment and off of drugs, the immediate objective of the searches was to generate evidence *for law enforcement purposes* in order to reach that goal. The threat of law enforcement may ultimately have been intended as a means to an end, but the direct and primary purpose of [the hospital]'s policy was to ensure the use of those means. In our opinion, this distinction is critical. Because law enforcement involvement always serves some broader social purpose or objective, under respondents' view, virtually any nonconsensual suspicionless search could be immunized under the special needs doctrine by defining the search solely in terms of its ultimate, rather than immediate, purpose. Such an approach is inconsistent with the Fourth Amendment. Given the primary purpose of the Charleston program, which was to use the threat of arrest and prosecution in order to force women into treatment, and given the extensive involvement of law enforcement officials at every stage of the policy, this case simply does not fit within the closely guarded category of "special needs."

*Id.* at 82–84, 121 S.Ct. 1281 (emphasis in original; footnotes omitted).

In the same way, Bay City's ordinance cannot be justified under the "special needs" exception to the requirement that a search of a person, including a search and seizure of breath samples, must be authorized by a judicial officer through the search warrant process.

### B.

■ Bay City also contends that as a general rule, exigent circumstances excuse the requirement of a search warrant whenever there is a need for breath samples from persons under age 21, and that they provide a basis upon which to uphold the ordinance. Although the existence of exigent circumstances must be determined from the facts of each case, Bay City insists that there is always an exigency when breath samples are sought, and therefore this exception to the warrants requirement can be legislatively determined and applied automatically.

The Supreme Court has consistently held that in the criminal context, warrantless searches are *per se* unreasonable, unless they fall within a few specifically established and well-delineated exceptions. *Payton v. New York,* 445 U.S. 573, 585–86, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The existence of exigent circumstances is certainly one of those exceptions.

■ "Exigent circumstances are situations where real immediate and serious consequences will certainly occur if a police officer postpones action to obtain a warrant." *United States v. Williams*, 342 F.3d 430, 436 (6th Cir.2003); *see also Thacker v. City of Columbus*, 328 F.3d 244, 253 (6th Cir.2003). The government bears the burden of proving that exigent circumstances existed. *United States v. Bates*, 84 F.3d 790, 794 (6th Cir.1996). The Sixth Circuit has explained that the following situations may give rise to exigent circumstances: "(1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape; and (4) a risk of danger to the police or others." *United States v. Johnson*, 22 F.3d 674, 680 (6th Cir.1994) (internal citations omitted); *see also Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). The Sixth Circuit has also set forth three factors that a court may use when inquiring whether "exigent circumstances" existed: (1) whether the government has demonstrated that the need for immediate action would have been defeated if the police had taken the time to secure a warrant; (2) whether the government's interest is sufficiently important to justify a warrantless search; and (3) whether the defendant's conduct somehow diminished the reasonable expectation of privacy he would normally enjoy. *United States v. Rohrig*, 98 F.3d 1506, 1518 (6th Cir.1996).

1.

■ Here, Bay City contends that evidence of alcohol use and possession is destroyed naturally over time due to a person's normal metabolic functions, and that the length of time required to obtain a search warrant, therefore, would preclude any meaningful utility of the PBT. The defendant has offered no evidence of the time period over which alcohol is metabolized, but the plaintiff posits that it is commonly known and not subject to serious question that alcohol in the blood dissipates at an average rate of 0.017 percent per hour, according to the "Widmark Formula," which is about one-half the alcohol taken into the blood stream after a 128–pound male consumes a 12–ounce can of beer. *See Michigan Drunk Driving Law and Practice*, at 9–18–9–20 (Inst. of Cont. Legal Ed., 3d ed. 1999 & Supp.2003); *Computing a BAC Estimate* (U.S. Dept. of Transportation/National Highway Traffic Safety Admin.), Oct. 1994, at 3, *available at* http://www.nhsta.dot.gov /people/injury /alcohol/bacreport.html. Shortly before oral argument in this case, the defendant filed an affidavit of one of its police officers claiming that three to four hours is required to obtain a search warrant because of the need to "prepare[ ] the warrant request, secure[ ] the approval of the Prosecutor, and then locate[ ] and obtain[ ] the approval and signature of a Judge." Aff. of Gary Gene Hect. ¶ 4. Based on professional experience, the Court views this claim with great skepticism, and the plaintiff has filed a counter-affidavit by an attorney in the Bay County public defender's office stating that a review of court records from actual prosecutions for drunken driving offenses discloses that once a suspect refuses to consent to give a breath sample, the time required to procure a search warrant for the sample is 20 minutes on average. The additional facts furnished by the plaintiff, not contradicted by the defendant on this record, are that "[t]he Bay City Police Department regularly uses fill-in forms, telephone, and FAX communications to expedite prompt approval of search warrant requests by their officers in routine drunk driving cases where breath tests have been refused." Aff. of Robert K. Hess ¶ 4.

At the summary judgment stage of the case, the Court accepts as true the assertion that in some cases, four hours may be

necessary to obtain a search warrant. The defendant has failed to address, however, the availability of telephone procedures, which, according to the plaintiff, are widely used and can result in a judicial authorization to take breath or blood samples in a relatively short time. These affidavits do not create a disputed issue of fact; they simply address different situations that can arise in the normal course of law enforcement.

■ Of course, "[t]he length of time required to obtain a warrant . . . is a factor in determining whether circumstances are exigent." *United States v. Radka,* 904 F.2d 357, 363 (6th Cir.1990). The record in this case, however, fails to establish that the evidence sought "would probably be destroyed within the time *necessary* to obtain a search warrant." *United States v. Elkins,* 732 F.2d 1280, 1284 (6th Cir.1984) (emphasis added). Courts must consider the amount of time necessary to obtain a warrant by telephone in determining whether exigent circumstances exist. *See United States v. McEachin,* 670 F.2d 1139, 1146 (D.C.Cir.1981). "Procuring a warrant by telephone generally will take less time than procuring one by the traditional means of appearing before a magistrate." *Ibid. See also Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981) (observing that "[i]n routine search cases . . . the short time required to obtain a search warrant from a magistrate will seldom hinder efforts to apprehend a felon. . . . [I]f a magistrate is not nearby, a telephonic search warrant can usually be obtained"); *United States v. Whitfield,* 629 F.2d 136, 142 (D.C.Cir.1980) (finding that "with telephonic warrants now permissible . . . the delay [in obtaining a warrant] may not be long at all"); *United States v. Baker,* 520 F.Supp. 1080, 1083 (S.D.Iowa 1981) (concluding that agents had inadequate time to travel to magistrate to get warrant but had abundant time to obtain one by telephone). *Compare United States v.*

*Hackett,* 638 F.2d 1179, 1184–85 (9th Cir. 1980), *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981) (holding that 20 to 30 minutes was inadequate to obtain telephonic warrant where police are pursuing suspect in a car), *with Baker,* 520 F.Supp. at 1083–84 (finding that one hour and 15 minutes was "abundant time" to obtain warrant by telephone, a process that takes not more than 30 minutes).

The practice of obtaining search warrants by telephone is quite common and, according to the plaintiff's unrebutted affidavit, readily available in Bay City. The claim made by the defendant's affiant, the Court presumes, is not intended to suggest the typical practice or even an average length of time, but rather is focused on the amount of time it *could* take to obtain a search warrant in an unusual case. Otherwise, it would be misleading. In all events, it plainly appears from the record that the four hours the defendant claims it would take to obtain a warrant is not the "necessary" amount of time. The time necessary to obtain a warrant in cases that fall within the scope of the ordinance does not create an exigency as a matter of legislative fact, nor does it serve to establish an automatic exemption from the warrant requirement.

2.

■ The plaintiff argues that the Court should not even consider exigent circumstances as an exception to the warrants requirement because the sole purpose for the search was to gather evidence of a petty, non-jailable offense. The plaintiff cites *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), in support of her argument. In that case, police officers followed a suspected drunken driver into his home to arrest him for that offense and to obtain evidence of his blood alcohol content. The police had neither an arrest nor a search warrant. The state

court upheld the action on the basis of exigent circumstances consisting of the hot pursuit of a criminal suspect, the need to prevent physical harm to the suspect and the police, and to prevent the destruction of evidence. The Supreme Court reversed and held that "application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense, such as the kind at issue in this case, has been committed." *Id.* at 753, 104 S.Ct. 2091.

Other courts have applied the holding in *Welsh* to invalidate arrests and searches in the face of exigent circumstance claims based on the possible dissipation of evidence in petty, alcohol-related offense cases. *See City of Jamestown v. Dardis,* 618 N.W.2d 495, 499 (N.D.2000) (holding that "probable cause to believe minors were illegally consuming alcohol was a relatively minor infraction and did not create exigent circumstances to justify a warrantless entry into a home"); *State v. Bessette,* 105 Wash.App. 793, 800, 21 P.3d 318, 321 (Wash.Ct.App.2001) (holding that exigent circumstances did not exist when police officer went into home to arrest minor he saw holding a bottle of beer because minor in possession is a minor offense and there was no evidence that minor was a threat to the safety of other individuals); *Commonwealth of Penn. v. Roland,* 535 Pa. 595, 600–601, 637 A.2d 269, 271 (Pa.1994) (holding that warrantless, nighttime entry into residence by police investigating report that there was underage drinking and marijuana use at a party was improper; there was no danger to police that would have necessitated immediate entry, and possibility that beer cans seen by officers might have been removed before warrant could be obtained would not support warrantless entry to investigate summary offense of underage drinking).

The defendant argues that the rationale of these cases is not controlling in the present matter because the minor nature of the offenses in *Welsh* and the cases that followed it contributed little weight to balance against the formidable level of the privacy interest associated with a personal dwelling. Indeed, the Supreme Court repeatedly has emphasized that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton,* 445 U.S. at 585, 100 S.Ct. 1371. Nonetheless, the fundamental principle that anchors *Welsh's* holding is that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense." *Welsh,* 466 U.S. at 753, 104 S.Ct. 2091. That sentiment was echoed by the Sixth Circuit in *Rohrig. See* 98 F.3d at 1516 (stating that "the seriousness of the underlying offense affects the weight of the governmental interest being served by the intrusion," and that such interests are "at an ebb" when minor offenses are involved).

■ Here, there is no question that the offense is relatively minor. The maximum penalty for a person convicted of being a minor in possession of alcohol is a $500 fine; the sanction does not include any jail time. The Court may refer to the penalty chosen as an "expression of the [City]'s interest" in gathering evidence to prosecute this offense. *See Welsh,* 466 U.S. at 754, 104 S.Ct. 2091. Although home entry may cause a more serious intrusion than a stop in public for the purpose of demanding a breath sample, the Court believes that the right to be left alone in public places ranks high on the hierarchy of entitlements that citizens in a free society have come to expect—at least in the context of citizen-police encounters—and one that is protected by the Fourth Amendment. *See I.N.S. v. Delgado,* 466 U.S. 210, 215, 104

S.Ct. 1758, 80 L.Ed.2d 247 (1984) (noting that "the protection against unreasonable seizures also extends to 'seizures that involve only a brief detention short of traditional arrest.'" (quoting *United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975))); *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (rejecting the argument that "that the Fourth Amendment does not come into play at all as a limitation upon police conduct if the officers stop short of something called a 'technical arrest' or a 'full-blown search,'" and holding that public encounters between police and citizens "must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures"). *But see Schenck v. Pro–Choice Network Of Western New York*, 519 U.S. 357, 383, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (holding that there is no right of a citizen to be free of unwanted speech in a public place, since "[a]s a general matter, . . . in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment" (quoting *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 774, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994), and *Boos v. Barry*, 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (internal quote marks omitted))). Given the petty nature of the offense for which the evidence was sought in this case, the Court finds that the defendant has failed to show that its interests were sufficiently important to justify the warrantless search.

### 3.

 The plaintiff in this case did nothing to diminish her expectation of privacy. *Compare Rohrig*, 98 F.3d at 1522 (approving the warrantless entry into a home to abate a noise nuisance based in part on the finding that the "[d]efendant here undermined his right to be left alone by projecting loud noises into the neighborhood in the wee hours of the morning, thereby significantly disrupting his neighbors' peace"). The defendant claims nonetheless that its practice is justified because it does not conduct random blood alcohol checks, but rather its policy allows only suspicion-based testing. Setting aside the question of whether the officer had sufficient information to focus his suspicion on the plaintiff in this case, the defendant's argument is answered by the Supreme Court's consistent holdings that absent a warrant, probable cause alone will not suffice to sanction a search or arrest. *See, e.g., Kirk v. Louisiana*, 536 U.S. 635, 636–38, 122 S.Ct. 2458, 153 L.Ed.2d 599 (2002) (per curiam); *Payton*, 445 U.S. at 588, 100 S.Ct. 1371; *Taylor v. United States*, 286 U.S. 1, 6, 52 S.Ct. 466, 76 L.Ed. 951 (1932); *Agnello v. United States*, 269 U.S. 20, 33, 46 S.Ct. 4, 70 L.Ed. 145 (1925). Probable cause must be accompanied by a warrant, exigent circumstances, or some other exception to the warrant requirement in order to make the search constitutional. *Kirk*, 536 U.S. at 637–38, 122 S.Ct. 2458; *United States v. Lewis*, 231 F.3d 238, 241 (6th Cir.2000).

### III.

The Court finds that the taking of breath samples to test for blood alcohol concentration in the circumstances of this case constitutes a search within the meaning of the Fourth Amendment. There are no special needs that excuse the application of the warrants clause to this practice. The purpose of obtaining the breath samples is primarily to gather evidence of a violation of the City's criminal ordinance. Moreover, exigent circumstances do not automatically exist that justify the failure to obtain a search warrant. To the extent that Section 10–57(e) of the Bay City Code of Ordinances authorizes warrantless searches in all cases, it is unconstitutional.

No exigent circumstances have been demonstrated on the record in this case that would have excused the City's police officers from obtaining a warrant to take the breath sample from Jamie Spencer.

Accordingly, it is **ORDERED** that the plaintiff's motion for partial summary judgment [dkt # 11] is **GRANTED.**

It is further **ORDERED** that the defendant's motion to dismiss or for summary judgment [dkt # 12] is **DENIED.**

It is further **ORDERED** that counsel for the parties appear for a status conference on **Thursday, December 18, 2003 at 4:30 p.m.** to address a case management plan to resolve the remaining issues in the case.